CLYDE ENGLE, Plaintiff-Appellant, v. FOLEY AND LARDNER, LLP, Defendant-Appellee (Siobhan Engle, Intervenor-Appellant).

First District (5th Division)   Nos. 1—08—2761, 1—08—2762 cons.

Opinion filed July 10, 2009.

Ted A. Donner, of Donner & Company Law Offices, LLC, of Wheaton, for appellant Clyde Engle.

John D. Lien, Amy P. Purcell, and Anna Downs-Temple, all of Foley & Lardner, LLP, of Chicago, for appellee.

F. John McGinnis, of Chicago, for intervenor Siobhan Engle.

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiff-appellant Clyde Engle (Engle) sought declaratory, injunctive and other relief against defendant-appellee Foley & Lardner, LLP (Foley), with respect to contractual agreements made between the parties regarding attorney fees. Intervenor-appellant Siobhan Engle (Siobhan), Clyde's wife and owner of the stock at issue, intervened. Although Engle and Siobhan initially received a temporary restraining order to prevent Foley from foreclosing on certain assets, the trial court, following a hearing, denied their motion for preliminary injunction and dissolved the temporary restraining order.

Engle and Siobhan appeal, making several contentions of trial court error, including a failure to consider evidence that showed Foley breached its obligation and held their interest "hostage," a failure to order an accounting, a misunderstanding of the presumption of undue influence, a disregard of evidence that showed an unenforceable contract, and a failure to apply the proper standard on a motion for preliminary injunction. They ask that we reverse the trial court's decision and find that their motion for preliminary injunction should be granted "pending a decision on the merits," plus any costs or additional relief we deem proper. For the following reasons, we affirm and dismiss the instant appeal.

## BACKGROUND

Engle hired Foley to represent him in a cause of action filed in the United States District Court for the Northern District of Illinois by the Illinois Insurance Commissioner (liquidator action), regarding an insurance company in which Engle held an interest. Initial damages in this suit were sought in the amount of $60 million; as the cause progressed, damages were estimated into the hundreds of millions of dollars. Engle and Foley's agreement was memorialized in a letter dated November 12, 1999, wherein Engle promised to pay Foley's invoices within 30 days.

Later, Foley also began representing Engle in a separate action occurring in Delaware. By June 2000, Engle and Foley devised a new payment schedule, which resulted in discounted rates of service to Engle. However, even with these new rates, Engle fell behind in his payments of Foley's fees.

In September 2001, Foley sent Engle a letter suggesting payment arrangements, including the possibility that Engle sell some of his assets to pay the charges in arrears. The letter also stated that Engle would pay reasonable costs of collection, including attorney fees, if Foley sued Engle for collection, and noted that if Engle failed to make payment, he would not object to Foley withdrawing from the pending liquidator action and the Delaware suit. Engle signed and returned the letter without any objection.

By February 28, 2002, Engle had still not yet paid the outstanding balance he owed to Foley, nor any of the newly incurred fees for services performed between September 2001 and February 2002. On that date, Foley sent Engle another letter informing him of this and that the amount owed was now $1,014,147.25. Foley proposed another amended fee agreement, wherein Engle would agree to a plan to pay this principal amount owed by April 5, 2002, via "mutually acceptable instruments to enforce the payment schedule," and Engle would not object to Foley's withdrawal from the pending liquidator action if he did not make the payments.[1] Again, Engle agreed and signed this letter without objection.

Engle failed to make any payment by April 5, 2002. On May 2, 2002, Foley sent Engle a notice of Foley's intent to withdraw as counsel of record in the liquidator action and suggested that Engle retain new counsel within the next two weeks, with Foley facilitating the transition. Foley sent a copy of this notice to Gerald Tierney, an attorney who was in-house counsel to various Engle-related entities, kept an office at the Bank of Lincolnwood (which Engle and Siobhan own), and had filed an appearance in the liquidator action on behalf of several Engle-owned entities involved. Soon thereafter, Foley sent Engle a letter stating that Engle had told Foley he would call to discuss payment arrangements, but that no call was ever received by anyone at Foley, and Foley's attempts to contact him had been unsuccessful. This letter also again advised Engle that if he was not going to make payment, he needed to arrange for new counsel. Foley sent a copy of this letter to Tierney. Later, Foley sent Engle, and again copied Tierney, a draft promissory note for the unpaid fee amount of $1,014,147.25, as well as

[1]By this time, the Delaware suit had been resolved and was no longer pending.

a detailed copy of its billing statements for September 2001 through April 2002. Engle did not object to the amount of fees Foley charged or the quality of the work Foley performed.

By July 2002, the liquidator action had been set for mediation. Foley sent Engle a letter reminding him that invoices for its work were unpaid and that Engle had yet to comment on the draft promissory note. Foley advised Engle that unless payment arrangements were in place by July 8, 2002, Foley would inform the mediator that it could not go forward with the mediation and would ask to withdraw from the liquidator action.

Ultimately, Foley and Engle entered into several agreements regarding Engle's outstanding fees; these agreements were dated August 8, 2002. In them, Engle, acknowledging his indebtedness to Foley and that he had an opportunity to consult with independent counsel about his situation and the agreements, executed a promissory note in the amount of $1,126,861.14, as well as a general security agreement granting Foley a security interest in various assets. The note stated that Engle would make regular payments, with a maturity date of July 2005. At this time, Foley and Engle understood that some of the assets in which Foley was granted a security interest by Engle might be needed to settle the liquidator action. It was therefore agreed between the parties that, should this occur, Foley would release its security to the extent necessary to effectuate a settlement. Following these agreements, Foley continued to represent Engle in the mediation.

The mediation continued through September 2002 but produced no result; the liquidator action proceeded and settlement discussions began in November 2002. In February 2003, the liquidator action was transferred by District Court Judge Amy St. Eve to Magistrate Judge Arlander Keys for settlement conference. On March 6 and 7, 2003, the parties, including Engle himself, appeared and presented the terms of settlement; Foley agreed that it would release its interest in certain of Engle's assets to effectuate the settlement, as promised. The parties were to finalize the settlement and return to court for status in April 2003. However, finalization of the settlement did not take place as anticipated, and Judge St. Eve set the cause for trial to begin in February 2004.

In the summer of 2003, Foley discussed internally via a memorandum "possible actions relative to" Engle, who, according to the memorandum, had paid about $2.5 million over the course of Foley's representation but still owed over $1.5 million in unpaid fees. The memorandum noted that Foley's need to release some of its security interest provided "a basis for exerting some pressure on Engle" and,

since Judge Keys had set a deadline of August 18, 2003, for completion of the settlement in the liquidator action, Foley's "maximum leverage point" would present itself in the next few weeks. The memorandum also recognized that Engle had signed an agreement allowing Foley to withdraw without objection and concluded by recommending that Foley "[e]xert as much pressure" as it could on Engle to retrieve its fees.

The settlement was not completed according to Judge Keys' deadline; rather, the parties continued to appear for status hearings before Judge St. Eve. At one such hearing in early December 2003, it was discovered that Engle, who had previously disclosed for mediation purposes a 50% stock ownership interest in the Bank of Lincolnwood, really only had a 22% interest; during the pendency of the liquidator action, Engle had transferred the bulk of his stock interest to Siobhan.[2] Judge St. Eve ordered Engle to personally appear before her in mid-December 2003. At this hearing, Judge St. Eve admonished Engle that the various parties to the liquidator action had been trying to settle the case for some time before her as well as Magistrate Keys, and that if the cause did not settle by February 2004, it would go to trial. Judge St. Eve also reminded Engle that Foley intended to file a motion to withdraw if the case did not settle and stated that she would most likely grant it. Engle acknowledged Foley's intent, but told the court that he could not be ready by February 2004. The court instructed him that he had two months to find new attorneys and that it would not continue the cause absent some emergency. On the same day, Foley presented the court with its motion to withdraw; Judge St. Eve continued it, stating that she would grant it at some point, but not while Foley was "this deep in settlement" and when she believed finalization of the settlement was so close.

At a January 2004 status hearing, Foley moved the court to withdraw from its representation of Engle insofar as it related to preparation for trial in the liquidator action, but would remain as counsel for purposes of attempting settlement. The court granted Foley's motion.

Thereafter, Engle and Foley discussed Foley taking an interest in Engle's stock in the Bank of Lincolnwood as substitute security for the interest Foley was releasing in order to effectuate settlement in the liquidator action. By February 2004, the parties returned before Judge St. Eve and told her that settlement in the liquidator action had been reached, with only a few minor points to be negotiated. Foley

---

[2]By the time the settlement agreement in the liquidator action was finalized, Engle's ownership dwindled even more, to 6.2%.

also informed the court that one of the fee issues had been resolved between it and Engle, with Foley taking the interest in the bank as discussed. Judge St. Eve then vacated the February trial date and retained jurisdiction over the matter until June 2004 to conduct a due diligence examination of Engle and obtain various orders of settlement.

Once again, however, the parties were unable to meet the court's deadline for finalization of the settlement, partly because Engle owned less of the bank stock than he represented and partly because problems arose in connection with the fee/stock interest agreement between Foley and Engle. Judge St. Eve agreed to mediate the dispute between Foley and Engle and, thus, the court extended its period of retention of jurisdiction over the liquidator action.

At this point, Engle was represented by attorney Howard Friedman, Siobhan was represented by attorney John McGinnis, and Foley was represented by attorney James Clark. In September 2004, to begin the mediation sessions with Judge St. Eve, which were attended by all the attorneys just mentioned, Clark wrote a letter to the court discussing Foley's position, which essentially noted that Foley was left unsecured by the current fees proposal because, following sale and distribution of profits to the main lienholders, Foley's share would amount to only $700,000. Clark's letter suggested that Engle waive his right to assert a setoff or counterclaim against Foley regarding the reasonableness of its fees or quality of its services, and proposed that Engle sign a waiver that he was aware of any conflicts in Foley continuing to represent him, that he waived these, and that he hired independent counsel (Friedman) to advise him. Neither Engle nor Friedman objected to any of these points, and Engle signed the conflict waiver.

By the end of 2004, various agreements between Engle, Siobhan, the liquidator, Engle's creditors and Foley were finalized, thereby settling the liquidator action.[3] As to Foley, Engle signed and executed a master payment agreement (MPA), two stock pledge agreements (one from Engle and the other from Siobhan), and a new promissory note. According to the MPA, Engle was to make a payment to Foley of $266,666.66 on a set "exchange date," a second payment of $133,333.33 on January 5, 2005, and then payments of $100,000 every three months over 3½ years, with final payment on July 2, 2008. The MPA also provided that if Engle defaulted, Foley would be entitled to obtain a judgment against him in federal district court pursuant to

---

[3]Engle settled the liquidator action as of January 31, 2005, and that cause was dismissed.

Judge St. Eve's retained jurisdiction. The new promissory note obligated Engle to pay Foley the amount of fees Engle had incurred since the original promissory note was executed in 2002; this note's due date was set, by Engle, for July 1, 2008. The total due Foley by Engle under these two agreements was $1,809,628.30. In addition, the stock pledge agreements stated that Engle's stock in the Bank of Lincolnwood (now at 6.2%) was pledged to secure payment under the new promissory note and that, if Engle defaulted on the MPA, and after July 1, 2007, Foley would then be granted the right to sell the stock, with certain limitations and conditions. This applied similarly to Siobhan's stock interest.

Engle made the $266,666.66 payment on the "exchange date" to Foley, as well as the $133,333.33 payment due January 5, 2005, as per the MPA. However, Engle did not make any further payments as dictated. Following the MPA's terms, Foley originally confessed judgment against Engle under Judge St. Eve's retained jurisdiction. Engle appealed, and the orders appealed from were reversed and remanded to the district court to clarify the scope of Judge St. Eve's retained jurisdiction. Upon remand, Judge St. Eve determined that she could not retain jurisdiction over the fee dispute between Foley and Engle, as it was ancillary to the liquidator action and had no independent basis for her federal jurisdiction.

Following that decision, Foley, this time as per the stock pledge agreements, sent notice to Engle that it intended to proceed with its right to liquidate the Bank of Lincolnwood stock pursuant to his default under the terms of the MPA. Engle, meanwhile, filed an action in chancery court seeking declaratory, injunctive and other relief relating to the fee agreements he signed with Foley, principally requesting an order that these, including the MPA, were void and unenforceable. Siobhan intervened in the cause with Engle. The trial court originally granted Engle and Siobhan a temporary restraining order to prevent Foley from foreclosing on their bank stock. The court then held a three-day hearing during which it heard evidence from numerous witnesses and examined several exhibits submitted by the parties, as well as their briefs.

The court began its written order by stating the requirements for a preliminary injunction and the law regarding attorney-client fee arrangements, particularly noting an attorney's initial burden to show that the arrangement did not arise from undue influence. Citing the four factors used by our state supreme court, the trial court examined the evidence presented and concluded that Foley had sustained its burden of showing no undue influence. That is, the court found that (1) Foley made full and fair disclosure to Engle of all material facts

regarding the arrangement, including conflicts with the liquidator action; (2) the transactions between the parties were fair to Engle, with Engle always admitting his indebtedness to Foley and Foley giving Engle discounts and lengthy time frames in which to make payments; (3) consideration for the agreements was adequate, as Foley agreed to forebear in its collection efforts in the event of default and allowed Engle to settle his debts with the liquidator and other creditors first; and (4) Engle had the benefit of independent counsel throughout the mediation and finalization of the fee arrangements with Foley.

After finding that Foley had "rebutted the presumption of undue influence," the court then turned to Engle's burden to show that the fee arrangements were indeed the product of such influence, as he claimed. Examining the time line of events, the court noted that Engle's consistent assertions that he was "forced" into the fee agreements and "had no other choice" were, at best, simply overstatements of the facts presented and, at worst, a "contrived" position; there was no "looming" trial date as Engle insisted, since after February 2004, that date set by Judge St. Eve had been stricken and the liquidator action had been dismissed. Moreover, the court pointed out that Engle readily admitted throughout the litigation that he "voluntarily" gave Foley security (the bank stock) for the unpaid fees as early as 2002, and that it is "axiomatic that any secured party asked to release a portion of the collateral for a debt would want replacement collateral." In addition, Engle never once informed anyone—Foley or any judges involved—that he disputed Foley's fees or its quality of service; rather, Engle assented to all of this. The court mentioned that while Engle was correct that an attorney cannot block a settlement by refusing to release collateral pledged as security for payment of his fee, "it is clear that Foley did not do so." Rather, Foley was exercising its rights, as it was within them to do, to request replacement collateral, while "Engle got everything he wanted," including settlement in the liquidator action, release of collateral, and the ability to pay Foley over an extended period of time. Engle simply did not pay his attorneys.

Therefore, the trial court held that Engle (and Siobhan) had not sustained their burden to demonstrate that the fee agreements with Foley were the product of undue influence. As such, the court found that Engle and Siobhan did not satisfy the elements for preliminary injunctive relief, since they had given their "ascertainable right" voluntarily to Foley to secure payment of their indebtedness; nor was there merit to their claims for an accounting or a declaration that Foley's fees were unreasonable, which neither Engle nor Siobhan had ever challenged before. Rather, the court concluded that there was "no threat of irreparable harm" and "no basis to award the extraordinary

remedy of a preliminary injunction." On September 9, 2008, the court accordingly denied Engle and Siobhan's motion for this relief, dissolved the temporary restraining order, and ordered the parties to return to court on September 16, 2008, for a status hearing.

On September 11, 2008, Engle and Siobhan filed separate notices of interlocutory appeal pursuant to Illinois Supreme Court Rule 307(d) (188 Ill. 2d R. 307(d)), seeking to file petitions and briefs to appeal the trial court's September 9, 2008, order dissolving the temporary restraining order. Foley responded, and on September 18, 2008, this court denied Engle's and Siobhan's petitions for leave to appeal.

On September 24, 2008, the parties again appeared before the trial court in a "case management hearing." Following argument regarding its September 9, 2008, order, the trial court reconsidered and modified it, granting Engle and Siobhan a preliminary injunction with the following condition:

> "Foley is restrained from selling the stock of Lincolnwood Bancorp that is the subject of this action until after September 30, 2008. The continuation of the stay beyond that date is conditioned upon Clyde and Siobhan Engle posting a surety bond in the amount of the fees 'due' Foley."

Also on September 24, 2008, Engle and Siobhan filed separate notices of interlocutory appeal, this time pursuant to Illinois Supreme Court Rule 307(a) (188 Ill. 2d R. 307(a)), seeking to file petitions and briefs to appeal the trial court's order of September 9, 2008, denying their motion for preliminary injunction. Neither Engle nor Siobhan posted any sort of bond following the trial court's September 24, 2008, order on or before September 30, 2008; in fact, neither has ever posted a bond in this cause pursuant to the trial court's order or otherwise.

## ANALYSIS

As noted above, Engle and Siobhan, who has intervened, appeal from the trial court's September 9, 2008, order entered in this cause. In seeking reversal of the court's decision to deny their preliminary injunction and remand for a trial on the merits, they assert several grounds of error, all based on the trial court's conduct, including its failure to consider evidence showing Foley breached its obligation and held their interest "hostage," its failure to order an accounting, its misunderstanding of the presumption of undue influence, its disregard of evidence showing an unenforceable contract, and its failure to apply the proper standard on a motion for preliminary injunction.

However, as a threshold matter, Foley argues that this appeal is moot at the outset because of the trial court's September 24, 2008, order that granted Engle and Siobhan an injunction conditioned upon their posting of a bond. According to Foley, the court essentially

reconsidered its September 9, 2008, order denying the preliminary injunction and instead gave Engle and Siobhan the relief they wanted when it prohibited Foley from selling the bank stock for seven days. In addition, Foley argues that because neither Engle nor Siobhan chose to meet the condition placed on this grant of the relief they sought (*i.e.*, they never posted a bond), nor chose to contest or appeal the trial court's September 24, 2008, order, they cannot appeal the matter at this point in time.

In response to Foley's threshold argument, Engle[4] declares that the trial court's September 24, 2008, order is "irrelevant to this appeal." That is, Engle first insists that the court's order was entered after he and Siobhan filed their notices of interlocutory appeal on the same day of September 24, 2008, at a time when the court accordingly had been divested of its jurisdiction over the matter. Engle then claims that even were this not so, he "could not comply with the order" since it made no specific determination as to how much should be posted as bond in the matter. Engle therefore demands that we strike any portion of Foley's brief on appeal relying on the September 24, 2008, order or addressing its contents.

We disagree with Engle and instead find that Foley's threshold argument is wholly correct regarding the circumstances presented.

As a point of reference, and as Foley notes, "[w]hen the issues have ceased to exist and there is no longer an actual controversy between the parties, the alleged cause of action has been negated and should be dismissed as moot." *Hanna v. City of Chicago*, 382 Ill. App. 3d 672, 676-77 (2008); see also *Fisch v. Lowes Cineplex Theatres, Inc.*, 365 Ill. App. 3d 537, 539 (2005) (appeal is considered moot if no actual controversy exists or if events have made it impossible to grant effectual relief to the plaintiff); *Keefe-Shea Joint Venture v. City of Evanston*, 364 Ill. App. 3d 48, 60 (2005) (same). This occurs precisely when the plaintiff in a suit "has secured what he basically sought and resolution of the issues could not have any practical effect on the existing controversy." *Hanna*, 382 Ill. App. 3d at 677. When this occurs, the cause of action should be dismissed, as reviewing courts are not to consider moot or abstract questions or render advisory opinions, even if to otherwise set precedent or offer future guidance in similar situations. See *Fisch*, 365 Ill. App. 3d at 539-40. Thus, once the plaintiff lacks a sufficient personal stake in the outcome of a cause, that cause must be dismissed. See *Hanna*, 382 Ill. App. 3d at 677; accord *Keefe-Shea*, 364 Ill. App. 3d at 60 ("[a]ctions will be dismissed once plaintiffs

---

[4]Siobhan never filed a response to, nor ever addressed, Foley's threshold argument before this court.

have secured what was originally sought); see also *Fisch*, 365 Ill. App. 3d at 540.

In the instant case, after Engle and Siobhan received a temporary restraining order, they petitioned the trial court for a preliminary injunction to prevent Foley from selling their stock in the Bank of Lincolnwood, in which they had given Foley their interest pursuant to the stock pledge agreements they executed during the settlement in the liquidator action. Engle himself has consistently admitted throughout this litigation that he voluntarily gave Foley this interest as security for payment should he default under the MPA and the new promissory note—this is also exhibited by the documents he signed and executed, under his independent attorney's guidance, promising to pay Foley the fees he owed. In fact, Engle did not at the time of signing these documents, nor does he now nor has he ever, contest this fact or the reasonableness of Foley's fees. The trial court initially denied Engle's and Siobhan's motion for preliminary injunction, declaring that they had not met the requirements to receive this relief that they sought. This was the substance of the court's September 9, 2008, order.

Yet, on September 24, 2008, before any activity occurred pertaining to the stock at issue, the trial court modified its order in part and granted Engle and Siobhan a preliminary injunction for seven days. Pursuant to the court's order, Foley was "restrained" from selling the stock until September 30, 2008. In addition, the court made clear that this "stay" it granted Engle and Siobhan could be extended beyond that time on one simple condition: Engle and/or Siobhan had to post a surety bond in the amount of the fees due Foley. Accordingly, Engle and Siobhan not only received a preliminary injunction for seven days, but they also had the opportunity to prevent Foley from selling the stock for an even longer period of time by posting the bond as ordered by the court. Engle and Siobhan, then, secured basically—in fact, exactly—the relief they originally sought.

What Engle and Siobhan did at that point in an effort to protect the rights they had now received from the trial court was wholly their choice. They did not post the bond; they did not fulfill the one and only condition required of them to secure their rights and prevent Foley from selling the stock after seven days. This was a risk they voluntarily undertook. Having secured what they basically sought, their appeal must be dismissed. See, *e.g., Hanna*, 382 Ill. App. 3d 672 (property owner's challenge to zoning ordinance amendment, wherein he sought to have prior amendments to ordinance declared unconstitutional and invalid so that his property would be restored to pre-amendment zoning classification, was rendered moot and his appeal was dismissed when his property was rezoned to the classification he

was seeking, thereby having secured essentially what he originally sought); *Fisch*, 365 Ill. App. 3d 537 (moviegoers' appeal from denial of their motion for preliminary injunction requiring theaters to provide notice that movies would start 10 to 15 minutes after published showtimes was rendered moot by theaters' implementation of new practice of doing just that and, thus, appeal was dismissed since moviegoers "secured what they sought in their prayer for relief"); *Keefe-Shea*, 364 Ill. App. 3d 48 (unsuccessful bidder's appeal for order declaring it to be the lowest responsible bidder on municipal project, to declare city's contract with successful bidder null and void, and for injunction to require city to enter into a contract with it instead was moot and appeal dismissed where complainant had secured what it basically sought when, during pendency of litigation, city terminated contract awarded to successful bidder).

Engle's arguments in response to this threshold issue, which we have already outlined above, hold no merit. First, and foremost, the trial court's September 24, 2008, order is not "irrelevant to this appeal." Engle insists that the trial court entered its order only after he and Siobhan had filed their notices of interlocutory appeal under Illinois Supreme Court Rule 307(a) earlier that same day and, thus, the trial court was divested of its jurisdiction over the matter. However, Engle provides no support for this in the record. He references the notices of appeal, which were time-stamped 9:31 a.m. and date-stamped September 24, 2008. Yet, the court's order, also date-stamped September 24, 2008, does not bear a time stamp. It is quite conceivable that the court entered this order before Engle and Siobhan filed their notices of appeal. Engle never cites to anything in the record, such as a transcript or other material, that would prove up his claim; thus, without more, we cannot accept it. See *Wackrow v. Niemi*, 231 Ill. 2d 418, 428 n.4 (2008) (appellant has burden of presenting sufficient record to support claims of error asserted and failure to do so will lead reviewing court to presume that order entered by trial court was proper, in conformity with law and had sufficient factual basis).

Likewise, an examination of the September 24, 2008, order itself shows that there is no basis for Engle's assertion that the court was divested of its jurisdiction. "Courts have the inherent power to review, modify, or vacate an interlocutory order at any time before final judgment." *Doe v. Department of Professional Regulation*, 341 Ill. App. 3d 1053, 1059 (2003); accord *Catlett v. Novak*, 116 Ill. 2d 63, 68 (1987). In its September 9, 2008, order, in addition to denying the motion for preliminary injunction and dissolving the temporary restraining order, the trial court ordered the parties to return to court "for status on September 16, 2008." None of the parties reference a meeting on that

date, but all refer to the next date of appearance as September 24, 2008. The court's order of that date begins by stating, "[t]his matter coming in for a case management hearing," and modifies the status of the bank stock that is "the subject of this action." From these words, it is more than reasonable to presume that this September 24, 2008, hearing was intended to be the status hearing the court had set in its September 9, 2008, order for September 16, 2008. At this time, the trial court was conducting a case management (or status) hearing and believed it had jurisdiction over the matter; it chose, as it had the right to do, to review and modify its prior order of September 9, 2008, before it became final. In addition, nothing had yet been done with the bank stock—the prime subject of the action at hand—nor had Engle or Siobhan paid any of the outstanding balance to Foley for its fees.

Moreover, the record is clear that Engle never objected to the September 24, 2008, order. He never appealed it, nor does he argue on appeal before us that the trial court did not indeed review, reconsider and modify its September 9, 2008, order to issue a preliminary injunction preventing Foley from selling the bank stock, which is what he and Siobhan originally sought in their prayers for relief from the trial court. We note that while Engle and Siobhan did file notices of interlocutory appeal of the September 9, 2008, order on September 11, 2008, before our court under Illinois Supreme Court Rule 307(d), these dealt only, by their words as per the notices, with the dissolution of the temporary restraining order. We denied these on September 18, 2008, and Engle and Siobhan did not appeal our decision. Their claims regarding the denial of the preliminary injunction came only later in the notices of interlocutory appeal they filed on September 24, 2008, under Illinois Supreme Court Rule 307(a), wherein they addressed their appeal solely to that portion of the trial court's September 9, 2008, order denying their motion for preliminary injunction. Therefore, Engle and Siobhan have waived any claim they have regarding the September 24, 2008, order's requirement that they post a bond and cannot be heard to contest it now. See *Webber v. Wight & Co.*, 368 Ill. App. 3d 1007, 1027 (2006) (failure to object before trial court and raise issue in posttrial motion results in waiver of issue for appellate review).

Waiver aside, even were we to examine the bond requirement of the September 24, 2008, order, we find that Engle's alternate argument that he "could not comply with the order in question if he tried" is nothing more than a red herring. That is, Engle insists that, since the trial court made "no specific determination" as to how much money should be posted as bond in the September 24, 2008, order (since it only referred to "fees 'due' Foley"), the order could not stand,

particularly since the parties "are obviously in disagreement over" how much is "due" Foley. We disagree.

The record shows that Engle and Siobhan were always well aware, throughout their entire involvement with Foley and Foley's representation of them in the liquidator action and the Delaware suit, of the fees that Foley was charging them. Engle never disputed that Foley consistently provided him with statements and bills outlining its fees; nor, again, has Engle ever disputed the quality or reasonableness of Foley's legal services or, for that matter, the amount charged—until now.[5] Engle participated in multiple discussions with Foley about these bills and, on numerous occasions, brokered deals that resulted in discounted rates and forgiven charges to Engle by Foley.

Ultimately, by the end of 2004, long after the Delaware suit had been resolved and as the liquidator action was being finalized, Engle voluntarily, without objection and under the supervision of independent counsel, entered into three fee agreements with Foley: the MPA, the stock pledge agreements and the new promissory note. The MPA required Engle to pay Foley $266,666.66 on a date certain, make a second payment of $133,333.33 on January 5, 2005, and then make payments of $100,000 every three months for 3½ years, with a final payment due on July 2, 2008. The stock pledge agreements pledged to secure these payments, and the new promissory note declared the total amount due Foley to be $1,809,628.30.

This final amount of $1,809,628.30 was set by these agreements signed and executed by Engle and Siobhan and reviewed with independent counsel. Again, neither Engle nor Siobhan ever disputed these. Nor did either ever contest this amount due Foley at any time when they initiated their suit for a temporary restraining order or injunctive relief; their claims there centered only on Foley's right to sell the interest it obtained in bank stock upon Engle and Siobhan's default under the MPA, never on the monetary amount they owed Foley as fees. Thus, it is clear to us, as it was undoubtedly clear to all the parties in this cause, including Engle, that "the amount of the fees 'due' Foley" referenced in the trial court's September 24, 2008, order requiring the posting of the bond to prevent the sale of stock after seven days was $1,809,628.30.

Engle makes a fleeting citation, with little to no cognizable argument, to section 11—101 of the Illinois Code of Civil Procedure in an effort to support his claim that the lack of specificity in the trial court's order as to what fees were "due" Foley (*i.e.*, a specific amount

---

[5]The principles of waiver, as outlined above, apply to this discussion as well.

of money) renders that order unenforceable. See 735 ILCS 5/11—101 (West 2006). The last paragraph of that section states, in relevant part:

> "Every order granting an injunction *** shall set forth the reasons for its entry; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained ***." 735 ILCS 5/11—101 (West 2006).

The purpose of this paragraph, which was added later as an amendment to section 11—101, was to require trial courts to be specific "where the circumstances may indicate the equity of some other result." *Streif v. Bovinette*, 88 Ill. App. 3d 1079, 1084 (1980). In other words, there was concern that terms of an injunction be definite and clear in order that there be no excuse or reason for a misunderstanding or a failure to comply. See *People ex rel. Traiteur v. Abbott*, 27 Ill. App. 3d 277, 283 (1975); see also *Paschen Contractors, Inc. v. Burrell*, 14 Ill. App. 3d 748, 752 (1973) (concern is that what the court intends by its order is "clear" and "easily discernible").

However, our courts have noted that where such risk of confusion or misunderstanding is relatively low or nonexistent, the technical failure to comply with the last paragraph of section 11—101 will not automatically render the order at issue invalid or require reversal. See *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 274 (2007). For example, some courts have held that, because trial courts have "substantial discretion" in deciding whether to grant preliminary injunctions, where a "simple motion for clarification *** would have sufficed to correct the deficiencies in the order," reviewing courts should affirm the order granting the preliminary injunction with a limited remand to the trial court to make these clarifications now. *Lifetec*, 377 Ill. App. 3d at 268, 274 (although trial court's grant of preliminary injunction referenced terms of documents signed by parties which were not included therein and, thus, did not comply with section 11—101, simple clarification by trial court on remand would resolve technicality since confusion as to what preliminary injunction required or prevented was not an issue; therefore, order should be affirmed with modification of remand for such clarification). Along these same lines, other courts have held that such orders may stand fully on their own, without even the need for remand or clarification. See *Cameron v. Bartels*, 214 Ill. App. 3d 69, 77-78 (1991) (failure of trial court to specify in order reasons for injunction, as dictated in section 11—101, was not fatal to order since issues in case were clear enough to apprise parties of reasoning and no one objected to form of order; therefore, neither reversal nor remand was warranted); see, *e.g., Donald McElroy, Inc. v.*

*Delaney*, 72 Ill. App. 3d 285, 295 (1979) (challenge alleging that trial court's order regarding preliminary injunction was vague and indefinite was meritless where order was "sufficiently definite to apprise the parties of its scope"); *Sports Unlimited, Inc. v. Scotch & Sirloin of Woodfield, Inc.*, 58 Ill. App. 3d 579, 584 (1978) (where examination of circumstances presented "leaves no doubt" that the trial court had made known to parties what was required of them pursuant to injunction order, contention that order could not stand because it was "not specific enough" was without merit and order affirmed); *K.F.K. Corp. v. American Continental Homes, Inc.*, 31 Ill. App. 3d 1017, 1020 (1975) (though trial court may have elaborated more fully as to injunction issued, failure to do so where circumstances showed parties were apprised of issues was not reversible error and order affirmed); *City of Chicago v. Geraci*, 30 Ill. App. 3d 699, 705 (1975) (injunction held to be sufficiently specific and, thus, affirmed).

In the instant case, we simply do not accept Engle's argument that the trial court's September 24, 2008, order granting him and Siobhan the injunctive relief they sought, with the opportunity for them to extend it by posting a bond in the amount of fees "due" Foley, was insufficiently specific or could have caused Engle or Siobhan confusion or misunderstanding regarding their obligations under that order. As noted, Engle and Siobhan knew how much they owed Foley via Foley's bills and the multiple discussions the parties had with each other regarding fees as well as with the various courts (Judge St. Eve, Magistrate Keys, and the state trial court) involved in this dispute. Further, the amount was undoubtedly solidified by late 2004 in the three fee agreements (the MPA, stock pledges and promissory note) Engle and Siobhan signed and executed, along with Foley, setting the amount at $1,809,628.30. In fact, Engle and Siobhan agreed to a systematic repayment of this amount due, with dates and amounts certain negotiated and selected by them. The trial court outlined this entire process and the amounts in its September 9, 2008, order. Moreover, Foley asserts in its brief on appeal that both it and Engle were present before the court on September 24, 2008, and that the parties argued their respective positions regarding the preliminary injunction issue, with Engle's counsel advocating for its imposition. Engle does not dispute this. Thus, we cannot help but conclude that Engle knew exactly what the court meant by its order instructing him and Siobhan to post "a surety bond in the amount *of fees 'due'* Foley" if they wanted to secure their injunctive relief beyond September 30, 2008, and that the court's order of September 24, 2008, does not require reversal (or even remand, for that matter) for indefiniteness under section 11—101. (Emphasis added.)

This ends our discussion regarding the merits of this appeal. Essentially, Engle and Siobhan secured the relief they originally sought in this matter: a preliminary injunction to prevent Foley from selling the Bank of Lincolnwood stock that Engle and Siobhan had given Foley in recognition of outstanding fees they owed for services completed in the liquidator action and Delaware suit in the amount of $1,809,628.30. In its clear and definite order, the trial court gave them this relief (without condition) for seven days. The court also gave them the opportunity to extend this relief longer, with the only condition being the posting of a bond in the amount of fees due Foley, which had already been agreed to and remained undisputed by all parties involved. Engle and Siobhan chose not to post this bond and, by this action, indicated that they no longer needed or wanted this relief from the trial court. Accordingly, the cause of action has been negated and this appeal must be dismissed, as no active controversy remains.

We would be remiss if we did not address one final issue regarding this appeal, one of a procedural nature. Illinois Supreme Court Rule 341(h) mandates that the parties to an appeal shall make their statement of facts "with appropriate reference to the pages of the record on appeal," and shall reference evidence in support of their contentions on appeal "to the pages of the record" where this evidence is found. 210 Ill. 2d Rs. 341(h)(6), (h)(7). Failure to provide proper citations to the record is a violation of this rule, the consequence of which is waiver of the facts or argument lacking such citation. See *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 51 (2005); accord *Gomez v. The Finishing Co.*, 369 Ill. App. 3d 711, 723 (2006). Our court " 'is not a depository in which [parties] may dump [their] arguments without factual foundation in hopes that [the court] will sift through the entire record to find support for a determination favorable to [their] position.' " *Mikrut*, 359 Ill. App. 3d at 51-52, quoting *Coffey v. Hancock*, 122 Ill. App. 3d 442, 444 (1984).

In the instant cause, Engle, and Siobhan via her adoption of his briefs on appeal, provided this court with two volumes of appendix containing many documents relevant to the appeal. Engle cites to these in support of his contentions, rather than to the record, in violation of Illinois Supreme Court Rule 341(h). See *MJ Ontario, Inc. v. Daley*, 371 Ill. App. 3d 140, 150 (2007) (documents not in record cannot be reviewed by appellate court). At the same time, we note that, while Foley's brief does make some citations to the record, these are incredibly few. To say that the parties' failure to cite to the record has made our review more onerous, is an understatement, not only in light of the voluminous record on appeal, but also because of the multiple and intricate dealings these parties have had which led to

this appeal in the first instance. See *In re Marriage of Cerven*, 317 Ill. App. 3d 895, 900 (2000). We again reiterate that strict adherence of Rule 341(h) is "necessary." *Maun v. Department of Professional Regulation*, 299 Ill. App. 3d 388, 399 (1998).

## CONCLUSION

Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court and dismiss the instant appeal.

Affirmed; appeal dismissed.

QUINN and TOOMIN, JJ., concur.