SECOND DIVISION
NOVEMBER 24, 2009

1-08-0081

CLARA TRAVAGLINI, Independent Executor of the ) Appeal from the
Estate of Bernard M. Travaglini, Deceased, ) Circuit Court of
) Cook County.
      Plaintiff-Appellee, )
)
      v. ) No. 03 L 14953
)
INGALLS HEALTH SYSTEM and INGALLS )
MEMORIAL HOSPITAL, ) Honorable
) Thomas R. Chiola,
      Defendants-Appellants. ) Judge Presiding.

PRESIDING JUSTICE CUNNINGHAM delivered the opinion of the court:

Following a jury trial of this wrongful death action, on September 13, 2007, the circuit court

of Cook County entered judgment on the jury's verdict of $500,000 for the plaintiff Clara Travaglini

(the plaintiff)[1], the independent executor of the estate of Bernard M. Travaglini (the decedent) and

his wife, and against the defendants, Ingalls Health System, a corporation, and Ingalls Memorial

Hospital, a corporation (the defendants). The defendants now appeal, alleging that the trial court

permitted the opinion of a lay witness, Lamont Carrel (Carrel), that he observed the victim choking

and that testimony was in fact a "medical opinion" and therefore erroneously admitted. They also

argue that the testimony of the plaintiff's expert witnesses was insufficient to meet the plaintiff's

burden of proof because those witnesses relied upon the erroneously admitted testimony of the lay

_____

[1]Although Clara's son, Albert Travaglini, was listed by the parties as a plaintiff in the trial
court and on appeal, he is not a party to the lawsuit, but was allowed to sit in Clara's stead at the
trial because of her ill health. Accordingly, he is not listed as a party in this opinion.

witness and therefore the trial court erred in failing to grant a directed verdict for defendants at the close of the plaintiff's case. In a second challenge to the testimony of the lay witness, Carrel, the defendants contend that the witness should not have been permitted to testify concerning what he observed as the decedent was dying and therefore a pattern instruction on determining damages for pain and suffering should not have been given. Illinois Pattern Jury Instructions, Civil, No. 31.10 (2006) (hereinafter, IPI Civil (2006). The defendants allege that the plaintiff's expert on nursing care, nurse Pamela A. Collins, should not have been permitted to testify that the defendants' nursing staff violated the standard of care. The defendants also assert that the jury verdict was contrary to the manifest weight of the evidence. They allege that one of the plaintiff's medical experts, Dr. Daniel M. Derman, testified to previously undisclosed medical opinions in violation of Supreme Court Rule 213 (210 Ill. 2d R. 213) and that his testimony should have been stricken. The defendants also challenge the testimony of expert witness Dr. James Bryant, the pathologist hired by the decedent's family to perform an autopsy and subpoenaed by the plaintiff, to testify at trial. The defendants allege that Dr. Bryant violated Rule 213 (210 Ill. 2d R. 213) because key portions of his testimony were not disclosed before trial. The defendants further assert that the trial court erred in not permitting them to submit two special interrogatories to the jury. They also contend that comments by the trial court denied them a fair trial. Finally, the defendants contend that the trial court erred in barring them from using a prior conviction to impeach the lay witness, Carrel. We affirm.

## BACKGROUND

The following facts were established at trial. On February 22, 2002, the plaintiff's 84-year-old husband, Bernard Travaglini (decedent), was hospitalized at Ingalls Memorial Hospital for overnight

2

monitoring because he had been complaining of not feeling well. Dr. Harish Bhatia testified that he had been the decedent's doctor for "many years." Dr. Bhatia was board certified in internal medicine and had his own practice, with admitting privileges at Ingalls Hospital. Dr. Bhatia testified that when he arranged for the hospital admission of the decedent, he specifically instructed Phyllis Badmus, a nurse at the hospital, that the decedent should be assisted with his food and monitored while eating. The decedent was known to experience difficulty swallowing food as the result of a stroke. Testimony at trial established that the decedent's wife, Clara Travaglini, always monitored and assisted him while he ate, to ensure that he ate slowly, ingesting only one piece of food at a time. There was also testimony that at mealtimes, Clara would cut the decedent's food into small pieces to minimize his swallowing difficulty. Dr. Bhatia testified that at about 10 p.m. on the day the decedent was admitted to Ingalls, he received a call from the hospital informing him that the decedent had died. He also testified that he had a "vague recollection" of being told that there was nobody in the room while the decedent was eating.

The decedent's three sons testified that he frequently would choke when he ate, but if he ate slowly he did not experience this problem. They also testified that the night before the decedent's scheduled funeral they decided to have an autopsy performed on him, after they received a telephone call from the mother of Lamont Carrel, the decedent's hospital roommate.

Carrel testified that he was 18 years old at the time of the occurrence and shared the hospital room with the decedent on the night in question. Carrel and the decedent were engaged in casual conversation when a nurse's aide brought the decedent a sandwich and then left the room. The aide, Jenica Mauban, testified that she could not recall anything about her interactions with the decedent.

3

According to Carrel, as the decedent was eating his sandwich, he began to choke. Carrel said that no one was monitoring the decedent while he ate. Carrel testified as follows:

> "Then we was talking, like, all of a sudden, like, I didn't really hear him talking no more and I hear him – I heard a struggle like he was choking. He was choking. I asked him was he all right, he was not responding, so he got violent. He got really violent. He was choking. He was struggling in the bed, so I started pressing the button for the nurse.

> * * *

> I heard him – I seen him choking. He was moving violent. He was struggling. He was trying to get out and sit up all the way. He was choking.

> * * *

> [In response to counsel's question regarding whether the decedent was making any sounds] Yes. Choking noise, violent – violent motions and he was choking. He was leaning into it, like his neck, he was choking."

According to Carrel, when he pushed the emergency button, a nurse came into the room within several minutes. He told her "The guy next to me is choking." The nurse ran out of the room and then numerous hospital personnel came in and began to work on the decedent. Carrel's trial testimony describing what he saw was as follows:

"They was working on him. They was doing a lot of stuff to

him but he didn't make it. I knew that just by looking – he was

looking at me the whole time. The whole time he was looking at me

with his eyes *** I know he didn't make it. I was looking at him."

The defense never submitted a motion *in limine* before trial to bar this testimony nor did they object nor seek to have this testimony barred or stricken during trial. They first objected to this testimony in their posttrial motion for a new trial, asserting that as a lay witness, Carrel was not qualified to testify that the decedent was choking.

The plaintiff presented the expert testimony of a registered nurse, Pamela A. Collins, on the question of whether the standard of care for nurses was breached in the care and treatment of the decedent. Collins testified that she had a bachelor of arts degree and a master's degree in nursing, as well as a bachelor of arts degree in community health and public education. She had been a nursing administrative supervisor and then became a nurse manager of a 27-bed medical-surgical unit. She had also taught nursing at a number of colleges and universities and had received a certification in medical-surgical nursing. In preparation for her testimony she had reviewed pertinent medical records and the depositions of nurse Phyllis Badmus, nurse's aide Jenica Mauban, the doctors who were involved in the case, and Lamont Carrel, the decedent's roommate.

Nurse Collins testified that the role of a nurse would be to supervise and manage the care of a patient like the decedent. The nurse's aide would act under the direct supervision of the nurse, performing supportive care, such as bathing and feeding the patient if the situation was sufficiently stable. Before the nurse delegated duties to an aide, the nurse had to determine that the duties were

appropriate for performance by the aide. Specifically, if a patient had a documented swallowing disorder, the nurse could only delegate the task of feeding the patient to an aide after assessing the experience level of the aide and determining whether the aide was qualified to perform that task. Nurse Collins testified that it was her understanding that there was an order that the decedent be monitored while eating. It was also her understanding that nurse Badmus delegated this monitoring to nurse's aide Jenica Mauban, without determining whether Mauban was qualified to perform the task. This was a deviation from the appropriate standard of care for a nurse. According to nurse Collins, nurse Badmus should have monitored the decedent herself. It was nurse Collins' opinion that given the decedent's medical condition, simply giving him a sandwich and leaving the room without any monitoring of the decedent as he ate the sandwich, as Jenica Mauban allegedly did, was a deviation from the appropriate standard of care.

Dr. James Bryant, the pathologist who was retained by the decedent's family to perform the autopsy on the decedent, was subpoenaed to testify by the plaintiff. He was board certified in the field of pathology, had previously been the chief pathologist at Provident Hospital in Chicago, and also had been on the faculty of Rush Medical College in Chicago. At the time of his testimony he was in private practice.

Prior to performing the autopsy, Dr. Bryant learned from the decedent's clinical summary that someone had witnessed the decedent choking on food before his death at the hospital. The autopsy revealed that there were food particles in the decedent's tracheobronchial tree. That structure consists of the air passages leading from the trachea to the lungs. Dr. Bryant found similar food particles in the decedent's esophagus, leading him to conclude that the decedent had aspirated, or

breathed in, food from his stomach and esophagus into his tracheobronchial tree. Dr. Bryant testified that he did not find any food bolus (a large piece of food) in the decedent's trachea, pharynx, or larynx. When he examined slides of samples taken from the decedent's lungs, he observed foreign particles in the most distant parts of the decedent's tracheobronchial tree. He could not identify these particles, but they were consistent with his finding of food particles higher up in the decedent's lungs. It was Dr. Bryant's testimony that these particles had to have been breathed into the decedent's lungs; they could not have been driven there by resuscitation efforts. Dr. Bryant concluded that this meant that the decedent was alive when the foreign particles entered his lungs. It was Dr. Bryant's opinion that the cause of the decedent's death was acute aspiration of partially digested food particles.

When asked if his diagnosis was consistent with a live person choking on food, Dr. Bryant responded that he did not find a food bolus. He also stated that he had learned earlier in the day of his trial testimony, while reviewing medical records shown to him by the plaintiff's attorney, that such a bolus had been removed from the decedent in resuscitation efforts, during the attempts to save the decedent's life. Defense counsel objected to this testimony as a violation of Supreme Court Rule 213. 210 Ill. 2d R. 213. The trial court initially overruled the objection, but when the defendants made the same objection the next day, the trial court sustained the objection and instructed the jury to disregard Dr. Bryant's testimony regarding learning that a food bolus had been removed from the decedent during resuscitation efforts. Dr. Bryant also testified that it was possible that the decedent was still eating when he aspirated stomach contents into his respiratory tract. The doctor explained the difference between choking and aspiration. He said choking is when a person's trachea is

7

blocked by something the person swallowed. Aspiration is an irritation of the lining of the respiratory tract, resulting in a cessation of breathing.

Dr. Daniel M. Derman, a specialist in internal medicine, was one of the plaintiff's medical experts. He is a graduate of the medical school at the University of Illinois, and performed his residency at Northwestern University, Feinberg School of Medicine and Northwestern Memorial Hospital in Chicago, where he worked an extra year as the chief medical resident. At the time of his testimony he was the president of a group of 85 physicians called the Northwestern Memorial Physicians Group. He estimated that he had treated close to 100 patients with a history of stroke and swallowing difficulties, similar to those of the decedent. In preparation for his testimony he reviewed the medical record of the decedent's admission to Ingalls Hospital in February 2002. He also reviewed Dr. Bhatia's record and deposition testimony, as well as the deposition testimony of the decedent's hospital roommate, Lamont Carrel; the Travaglini family members; the nursing personnel involved in the decedent's care; and the defense experts.

Dr. Derman testified that his review of the medical records established that the decedent had been eating a turkey sandwich before medical assistance was summoned. In their resuscitation efforts the medical personnel tried to insert a breathing tube, but food blocked its passage. A second tube was inserted, but food particles continued to block it. The Heimlich maneuver was attempted twice on the decedent with no success. Medical personnel then used suction to remove large particles of food. Suddenly the food was dislodged, and the decedent's trachea opened up. However, this was after 14 minutes of trying to unblock the trachea.

After reviewing all of the materials described, it was Dr. Derman's opinion, to a reasonable

degree of medical certainty, that the decedent died because portions of the turkey sandwich which he was eating blocked his trachea and caused respiratory failure. Dr. Derman testified that a less likely cause of death was that of choking on aspirated food, which is food that came up from the decedent's stomach. In response to questions from the defense attorney, Dr. Derman also testified that it was "very, very unlikely" that the decedent died of a stroke or heart attack. It was similarly unlikely that the food particles found in the decedent's lungs got there after his death. Dr. Derman based this opinion in part on the eyewitness testimony of Carrel, who said that the decedent began to choke while eating a sandwich. It was also the doctor's opinion that if the decedent had been monitored while he was eating the sandwich, his death would have been prevented. In response to additional questions, Dr. Derman testified that even if food particles found in the decedent's respiratory tract had been acidified, this would not necessarily mean that the particles originated from the stomach. The particles could have become acidified during disintegration of the body following death. He also stated that in addition to asphyxiation from food particles ingested by mouth, stomach contents could also contribute to asphyxiation.

Nurse Phyllis Badmus testified for the defendants that she attended to the decedent on the night of his death. She denied that Dr. Bhatia had told her that the decedent should be monitored when eating. She also testified that the hospital admission notes contained no instructions about assisting the decedent with eating. Nurse Badmus admitted that if there had been an order to monitor the decedent while eating, then her failure to do so would have been a deviation from the appropriate standard of nursing care. But nurse Badmus also testified that the decedent's wife told her of concerns about decedent's eating and swallowing difficulty. For this reason, nurse Badmus instructed

the nurse's aide, Jenica Mauban, to monitor the decedent while he ate. She agreed in her testimony that the hospital record established that during resuscitation efforts, a large amount of "food" was removed from the decedent's trachea. She also agreed that the record establishes that hospital personnel used the Heimlich maneuver on the decedent several times during the resuscitation efforts. They ultimately were successful in clearing his trachea, but the decedent did not recover and was pronounced dead at 10:54 p.m. that evening.

Dr. Jay Goldstein, board certified in gastroenterology and in internal medicine, a professor at University of Illinois at Chicago and the director of its Clinical Research Center, testified as a medical expert for the defendants. He explained the mechanisms of eating and breathing. When one chews food it forms what is called a bolus, which is a mound or grouping of food, that is swallowed and goes down the esophagus into the stomach. The stomach churns the food and turns it into a liquid, which is called chyme. When air is breathed, it goes down the trachea and into the lungs. The esophagus and the trachea come together in the pharynx. At the convergence of the pharynx there is a flap, called the epiglottis, which ordinarily covers the trachea when food is being swallowed, so that chewed food is directed into the esophagus instead of the trachea.

Dr. Goldstein reviewed the depositions of Dr. Bryant, Jenica Mauban, nurse Badmus, Dr. Bhatia, the Travaglini family, nurse Annette Nancy Bannon (one of the nurses who responded to the emergency), and Dr. Derman, as well as the medical charts for the decedent's admission to Ingalls Hospital on February 22, 2002, Dr. Bryant's autopsy report, and the decedent's death certificate. Dr. Goldstein was asked to evaluate the opinion of Dr. Derman (as given in Dr. Derman's pretrial deposition) that the decedent's death was due to choking on a food bolus that became lodged in his

trachea. Dr. Goldstein disagreed. It was Dr. Goldstein's belief, to a reasonable degree of medical certainty, that the decedent vomited and then aspirated the vomitus into his lungs, blocking the large air pathways and then eventually the small air pathways. This caused the decedent to be unable to breathe and led to cardiac arrest and death. Dr. Goldstein believed that the contents of the decedent's lungs consisted of small pieces of acidified food, as would be found in the stomach. This appeared to be consistent with the aspiration of stomach contents.

Dr. Goldstein agreed that the medical record indicated that the decedent had difficulty swallowing. He cited the facts found in the report: the attempts to resuscitate the decedent; the attempt to place a breathing tube in the decedent's throat; the absence of a large piece of turkey or bread being found during resuscitation efforts; and the discovery of small particles of food which were acidifying. Dr. Goldstein testified that this was consistent with the autopsy findings; specifically that particles of food in the esophagus were acidified and matched the particles of food found in the trachea and lungs. Dr. Goldstein explained that food is only acidified after it is swallowed and is in the stomach. In the stomach, the pieces of food are much smaller than chewed food which has not yet been swallowed.

Dr. Goldstein learned from the medical record that when the decedent was found, he was not breathing. Cardiopulmonary resuscitation (CPR) was administered and a breathing tube was placed in the decedent's trachea to attempt to deliver oxygen into his lungs. There was a blockage, so hospital personnel attempted to suction the breathing tube. This was unsuccessful, so they inserted a larger breathing tube. Eventually they removed particles of food and were able to administer oxygen to the decedent.

Dr. Goldstein stated that if Carrel testified that he witnessed the decedent choking on food while eating a sandwich, this would not mean that food contents had aspirated from the decedent's stomach. Dr. Goldstein theorized that the decedent's gag reflex could have been triggered by partially chewed food becoming lodged in his throat. The result would have been vomiting of the stomach contents. However, Dr. Goldstein testified that he did not believe that this is what happened to the decedent, because there was no reported observation of a bolus of partially chewed or non-acidified food during the resuscitation. The personnel attending to the decedent saw particles, not pieces of food. However, Dr. Goldstein also agreed that there is a continuum when food is eaten. As food is chewed, swallowed and enters the stomach, the pieces of food become progressively smaller. The doctor stated, "The fine line between *** food that you chew and food that's dwelled in your stomach for two to three hours, *** there's no good definition to separate those two, it's a continuum and, so we use the terms interchangeably." He concluded that describing something as food does not necessarily mean anything other than it came from somewhere between the mouth and the stomach.

Dr. Goldstein disagreed with the opinion of Dr. Bhatia, the decedent's physician, that the cause of death was choking on food. He noted that the Heimlich maneuver was attempted on the decedent several times, but was unsuccessful, noting that the medical report did not mention the dislodging of a "piece of something."

The defendants presented the expert testimony of MariJo Letizia, a full-time nursing instructor at Loyola University-Chicago. She testified that she had completed a nursing degree at Loyola University. She also obtained a master's degree in nursing from Northern Illinois University, another

master's degree in nursing and a doctoral degree from the Loyola University Chicago School of Education. Nurse Letizia reviewed the decedent's hospital record as well as the deposition testimony of many of the doctors and nurses testifying in the case. It was her opinion that nurse Badmus did not deviate from the appropriate standard of care in her care and treatment of the decedent on February 22, 2002.

Nurse Letizia observed that nothing in the decedent's medical chart indicated that the decedent had dysphagia (difficulty swallowing). However she did acknowledge that nurse Badmus had written on the decedent's chart that the decedent's wife had requested that the decedent be watched while he ate. Nurse Letizia disagreed with the opinion of nurse Collins that nurse Badmus should have personally monitored the decedent while he ate. However, she agreed that the standard of care required that the nurse's aide, Jenica Mauban, who was assigned to monitor the decedent, should have remained with the decedent and monitored him while he ate.

Dr. Nancy Jones testified as a medical expert for the defendants. She was retained to examine the proximate cause opinion of Dr. Derman, the plaintiff's medical expert. She is a clinical pathologist and at the time of her testimony she was a medical examiner for Cook County. Doctor Jones is board certified in anatomic pathology, clinical pathology, and forensic pathology. She also served as a professor of pathology at Chicago Medical School. In preparation for her testimony she reviewed the decedent's death certificate, his autopsy report, and the depositions of Dr. Bryant and Dr. Derman. However she did not review the decedent's medical record concerning resuscitation efforts and she did not review Carrel's deposition.

In Dr. Jones' opinion, there was no indication that the decedent was alive when the food

entered his lungs. She believed that the material found in the decedent's lungs traveled from his stomach to his lungs by agonal aspiration, which occurs in the process of death when the sphincters (valves) which keep the food in the stomach fail and allow passage of food into the esophagus and the trachea. The food could also be forced into the trachea during resuscitation efforts. Dr. Jones also testified to her belief that the decedent did not choke at all, because no bolus of food was found obstructing his airway. It was her opinion that when the decedent died, the sandwich he was given was "long eaten." She testified that she was unable to form an opinion on the cause of death, which could have resulted from the decedent's heart disease or a stroke or a heart attack

On cross-examination, Dr. Jones admitted that she had not known that the medical record established that it had been difficult to place a breathing tube in the decedent and when air was forced through the tube, a large amount of food came up. She also admitted that a patient with a swallowing disorder who was eating a turkey sandwich and began to have difficulty swallowing could have food impacted in his trachea which would cause difficulty with placement of a breathing tube during resuscitation efforts. But she testified that she could not identify this as the cause of death because she had not reviewed the deposition of Carrel. Even when advised of Carrel's testimony that he observed the decedent begin to choke while eating a turkey sandwich, she testified that Carrel may have simply been misinterpreting the signs of the decedent having a heart attack. She also testified that it was possible that while the decedent was eating his sandwich and talking with Carrel, he experienced a stroke or some sort of cardiac problem. However, she admitted that based on the information which she had reviewed, she could not give an opinion that a particular cause of death was more probably true than not.

Nurse Annette Nancy Bannon testified that she was one of the nurses who responded to the emergency concerning the decedent. She acted as the recorder during the resuscitation efforts, writing down what occurred. When the emergency team arrived, the decedent was not breathing and did not have a pulse. The team administered CPR and also attempted to place a breathing tube into the decedent in order to administer oxygen to him. Large amounts of food particles were suctioned from him, but none of them was recognizable as a bolus of food. Several attempts of the Heimlich maneuver did not succeed in removing the blockage. Eventually, medical personnel were able to place the breathing tube and administer oxygen while attempting to restart the decedent's heart by shocking it. But they could not restart the heart, and within 21 minutes of placing the breathing tube, the decedent was declared dead.

After its deliberations, the jury entered a verdict for the plaintiff in the amount of $500,000 and the trial court entered judgment on that verdict. This appeal ensued.

## ANALYSIS

Although the defendants raise several issues, their primary contention on appeal, which they strenuously argued during oral argument, is that a lay witness, decedent's hospital roommate, Lamont Carrel, should not have been permitted to testify that he believed the decedent began choking while the decedent was eating a sandwich. Defendants contend that this testimony constituted a medical opinion that should only have been presented by an expert witness, and Carrel lacked that expertise. Therefore, they argue, it was reversible error for the trial court to allow this testimony into evidence. This contention constitutes the gravamen upon which the defendants base most of their remaining arguments.

We first address the issue of Carrel's testimony since the remaining issues build upon the foundation that it was error to allow Carrel's testimony of what he observed. As we have previously noted, the defendants made no *in limine* or contemporaneous objection to Carrel's testimony. They did not seek to *voir dire* him, nor did they move to bar his testimony after it was completed. Instead, the defendants first raised the objection to Carrel's testimony after the jury reached a verdict in the plaintiff's favor. Thus, the defendants failed to properly preserve the issue and have forfeited it for purposes of appeal. Wheeler-Dealer, Ltd. v. Christ, 379 Ill. App. 3d 864, 870, 885 N.E.2d 350, 356 (2008).

However, we also note that the record establishes that the plaintiff presented ample evidence to support the jury's verdict. The plaintiff introduced evidence, which the jury apparently believed, that both Dr. Bhatia's order that the decedent be monitored while eating and the request by the decedent's wife that he be assisted with eating were disregarded by the nursing staff. In fact, the jury clearly concluded that the decedent was not monitored while he was eating, despite a history of choking while eating. His hospital roommate, Carrel, whose testimony was not objected to by the defendant's until after the verdict, said that he saw the decedent choke on the sandwich and then begin struggling to breathe. Within minutes, hospital personnel attempted to clear the decedent's airway so that he could breathe, including repeated attempts of the Heimlich maneuver. Only after 14 minutes did they succeed in clearing his airway, after suctioning out large amounts of food. He was pronounced dead within less than one hour of the start of these resuscitation efforts. Expert testimony presented by the plaintiff established that the treatment given to the decedent deviated from the appropriate standard of care. The plaintiff also presented expert opinion that the decedent died

16

as the result of choking on his sandwich. The jury heard the testimony of the plaintiff's experts and the testimony of the defense experts. The jury obviously found the plaintiff's experts more credible. There is nothing irregular or erroneous about the finding by the jury. Indeed, that is precisely what our jury trial system is designed to do.

The defendants also assert that they were denied a fair trial when, at the close of the plaintiff's case, the trial court summarily denied the defendants' motion for a directed verdict without allowing them to present argument on their motion. In light of our determination that the plaintiff presented ample evidence to prove her case, we need not address that argument further.

The defendants next assert that the trial court erred in giving the jury IPI Civil (2006), No. 31.10 concerning the jury's ability to assess damages for the decedent's "conscious pain and suffering" which resulted from the defendants' negligence. The entire instruction states:

> "If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the estate for any of the following elements of damages proved by the evidence to have resulted from the [negligence] of the defendant[s] during the period between the time of the decedent's injuries and the time of his death, taking into consideration the nature, extent, and duration of the injury:
>
> > The conscious pain and suffering experienced as the result of the injuries.
> >
> > Whether any of these elements of damages has been

proved by the evidence is for you to determine." IPI

Civil (2006), No. 31.10.

The defendants again contend that as a lay witness, Carrel was not qualified to testify to what he observed of the decedent's experience immediately before death, because that goes directly to the conscious pain and suffering of the decedent. But as we have noted in our discussion of the first issue raised by the defendants, this objection was not made when Carrel offered his testimony at trial. Thus, the defendants have forfeited this issue. Wheeler-Dealer, Ltd. 379 Ill. App. 3d at 870, 885 N.E.2d at 356 (2008).

The defendants also contend that the plaintiff's nurse expert, Pamela Collins, should not have been permitted to testify that the nursing staff deviated from the appropriate standard of care by not monitoring the decedent while he was eating his sandwich. To the extent that this contention is based upon nurse Collins relying upon the testimony of Carrel, as we have already found, any objections to that testimony have been forfeited. Furthermore, the defendants' own witness, nurse Badmus, who was the nurse responsible for decedent's care, admitted that if there had been an order to monitor the decedent while eating, the failure to do so was a deviation from the appropriate standard of care. Dr. Bhatia testified that he gave such an order and the jury obviously believed him. Additionally, nurse Badmus' own notation in the decedent's record stated that the decedent's wife had requested the same monitoring because of the decedent's swallowing difficulties. The record does not disclose why Clara's request was disregarded by nurse Badmus.

The defendants also contend that the jury's verdict for the plaintiff was contrary to the manifest weight of the evidence and therefore the case should be reversed and remanded for a new

18

trial. Again, this argument is based on the defendants' challenge of Carrel's testimony and the plaintiff's expert testimony based on Carrel's observations, and therefore the issue has been forfeited. The defendants also suggest that the testimony of their expert, Dr. Goldstein, that the decedent died as a result of aspirating food, not from choking on food which he had just swallowed, negates the plaintiff's case. But we note that the plaintiff's first amended complaint was based upon the negligence of the defendants in failing to *monitor* the decedent while he was eating despite explicit directions from the admitting physician and an additional warning, from the decedent's wife, that the decedent had difficulty swallowing. The complaint alleged that the decedent died as the result of this negligence, specifically, failure to monitor him. There was sufficient evidence for the jury to conclude that the decedent choked on a sandwich which he ate without any supervision. But there was also evidence that it was aspiration of stomach contents which caused the decedent to stop breathing. This evidence was also sufficient to meet the plaintiff's burden of proof in accordance with the complaint. In summary, the plaintiff's complaint was not dependent upon the decedent having *choked* on food. The underpinning of the plaintiff's complaint was the *failure to supervise the decedent while he ate*. The plain inference which the jury could and apparently did draw was that while the decedent was engaged in unsupervised eating, which should have been supervised, an event occurred which resulted in his death. Accordingly, we hold that the evidence at trial was sufficient to allow the jury to conclude that the plaintiff met her burden of proof, despite the testimony of the defendants' experts. Alternatively, expert testimony was also presented that aspiration caused by choking could have contributed to the decedent's death.

The defendants have also forfeited their claim that plaintiff's expert, Dr. Derman, was not

qualified to testify as an expert and, in particular, that his testimony in violation of Supreme Court Rule 213 (210 Ill. 2d R. 213) should have been stricken. Contrary to the defendants' contention in oral argument before this court, which the defendants later attempted to retract in a postargument motion, we find no motions *in limine* filed by the defendants in the record on appeal, nor has defense counsel cited to specific pages of the record where the defendants filed a motion *in limine* concerning Dr. Derman's testimony. Further, the defendants fail to allege that they challenged Dr. Derman's credentials, expertise, or violations of the rules of which they complain on appeal. Their appellate briefs fail to refer this court, in instances too numerous to cite, to any specific pages in the record where these objections were made in the trial court. Thus the defendants have forfeited these issues. Engle v. Foley & Lardner, LLP, 393 Ill. App. 3d 838, 854, 912 N.E.2d 715, 728-29 (2009).

The defendants also complain that the plaintiff's expert witness, Dr. Bryant, violated Illinois Supreme Court Rule 213 (210 Ill. 2d R. 213) by testifying to opinions not disclosed before trial. Dr. Bryant testified that on the morning of trial, the plaintiff's attorneys showed him a record suggesting that a bolus of food had been removed from the decedent during resuscitation attempts. As noted earlier, the trial court initially denied the defendants' objections to this testimony. When the defendants later renewed their objections, the trial court sustained those objections, struck the testimony of Dr. Bryant on that point and instructed the jury to disregard the stricken testimony. Illinois law establishes that such actions by the trial court ordinarily suffice to cure prejudice arising from inadmissible testimony. Adami v. Belmonte, 302 Ill. App. 3d 17, 27, 704 N.E.2d 708, 715 (1998); Dahan v. UHS of Bethesda, Inc., 295 Ill. App. 3d 770, 780-81, 692 N.E.2d 1303, 1310-11 (1998). In light of the other sufficient evidence in this case, any error which may have resulted from

the stricken testimony was clearly harmless. Trettenero v. Police Pension Fund, 333 Ill. App. 3d 792, 801, 776 N.E.2d 840, 849 (2002).

The defendants also erroneously contend that it was impermissible for Dr. Bryant to testify that choking on food could also cause regurgitation of food. The defendants claim that this testimony was a violation of Rule 213. 210 Ill. 2d R. 213. We note, however, that the subject testimony embraced the defendants' theory that the decedent died when he aspirated his stomach contents. The defendants contend that this opinion was not disclosed to them prior to trial. But in fact the record establishes that defense counsel withdrew an objection to this testimony when it was demonstrated that the witness had testified in a similar fashion in his pretrial deposition. Accordingly, we find no error in the admission of Dr. Bryant's testimony on this point.

Although the defendants contended during oral argument that the trial court erred in barring them from presenting two special interrogatories to the jury, the record establishes that the defendants voluntarily withdrew one of the proffered special interrogatories. The one interrogatory which the defendants were barred from submitting stated: "Did [the decedent] choke and expire as a result of a food bolus from the mouth while eating unattended?" The plaintiff objected to this interrogatory because it presented only one possible cause of death, ignoring evidence that aspiration of stomach contents could have contributed to that death. The trial court found that the interrogatory was not one to which the jury could easily answer yes or no, given the complicated testimony presented throughout the trial. The trial court went on to state:

> "It's very clear what the jury is going to be doing. It's going to be
>
> asked to determine whether or not this individual was left unattended

and died as the result of that and everybody can argue from the evidence that has been given and this [interrogatory] will complicate that decision on that issue which is the central issue in the case for the jury to decide. It is not a simple statement of fact and I find that it will complicate matters for the jury's decision on the ultimate issue in the case[;] therefore, I'm not going to be giving it."

A trial court may properly deny an interrogatory that is misleading or confusing. Blakey v. Gilbane Building Corp., 303 Ill. App. 3d 872, 882, 708 N.E.2d 1187, 1194 (1999). We hold that the trial court properly denied this interrogatory on both grounds.

The defendants also complain of what they deem to be multiple improper comments by the trial court which they contend subjected them to prejudice in the eyes of the jury. The defendants failed to move for a mistrial on that basis and consequently have forfeited this issue. Wheeler-Dealer, Ltd., 379 Ill. App. 3d at 870, 885 N.E.2d at 356; see People v. Harbold, 262 Ill. App. 3d 1067, 1070, 635 N.E.2d 900, 903 (1994) (the defendant's failure to move for a mistrial based on prosecutorial misconduct waived, or forfeited, his right to block retrial upon a finding by the reviewing court that reversible error had occurred). Furthermore, our review of the record establishes that the trial court was evenhanded in ensuring that questioning by either side did not wander far afield from the issues in the case. Often the conduct of the attorneys required the trial court to refocus the questioning on the issues at hand.

Lastly, the defendants contend that they should have been permitted to impeach Carrel with a prior conviction. The misdemeanor conviction in question occurred two years after Carrel gave his

22

pretrial deposition relating to this case. In deciding whether to permit the use of the conviction for impeachment purposes, the trial court was able to take into consideration several factors. The trial court discussed its reasoning and the balancing test which it applied in denying the defendant's motion to impeach Carrel with the prior conviction. The trial court stated in part:

> "THE COURT: *** I think further factors to be considered by me in determining whether the probative value outweighs unfair prejudice or vise versa concerns just what role he plays here since he's not a party, he's an occurrence witness apparently having no stake in the outcome of this case, that is a factor for me to consider as to whether or not we let the facts and the rest of the cross-examination of him, let the jury determine credibility based upon that rather than on something that occurred well after the facts of this case and as you said, Mr. Strelecky, well after he had given certain statements concerning this, so I will take this under advisement and make a ruling before he's called to testify."

The fact that Carrel was a disinterested party in the lawsuit was clearly a major factor in the trial court's decision to prevent the introduction of Carrel's misdemeanor conviction. He was the decedent's roommate in the hospital and the only person who actually witnessed what occurred. Carrel had met the decedent only shortly before the decedent's death. Carrel had no stake in the outcome of the trial. The trial court ruled that disclosure of Carrel's misdemeanor conviction, which occurred two years after he had given his pretrial deposition, would have served no useful purpose.

23

1-08-0081

The court explained its reasoning on the issue prior to ruling, stating in pertinent part:

> "THE COURT: Concerning the use of any prior conviction of Mr. Carrell, I have reviewed the case law. I have also reviewed the situation in terms of a balancing test of the probative value versus the unfair prejudice. I believe since his testimony was preserved by way of deposition previously before any – before he was placed on supervision for this event, since the conviction by way of guilty employee was for something called a deceptive practice, while that might be a crime of dishonesty, even though it was a misdemeanor, the individual was placed on supervision and the conviction could ultimately be expunged by successful completion of supervision because the testimony was previously preserved well before this plea of guilty, because there are several other factors available to the defense to question the accuracy and/or credibility of this witness, I believe in balancing this test – in the balancing test that I have performed, it would be inappropriate to allow the use of this conviction in cross-examination of Mr. Carrell and, therefore, I'm going to limit the defense from doing that."

It is within the sound discretion of the trial court to balance the probative value of a prior conviction against its prejudicial impact. The trial court clearly took the relevant factors into consideration in performing a balancing test regarding the admissibility of Carrell's prior conviction. Knowles v.

24

Panopoulos, 66 Ill. 2d 585, 587-88, 363 N.E.2d 805, 807 (1977). We find no abuse of discretion in the trial court's decision to bar the defendants from impeaching Carrel with his prior misdemeanor conviction.

We are compelled to comment on the arguments and materials provided to us for review by the defendants. The defendants' briefs are replete with omissions of record citations; with record indexes that omit citations to trial witnesses; and with omissions of critical facts upon which they base some of their strongest appellate arguments. For instance, on appeal they continued to cite as error the trial court's initial refusal to grant their motion to strike certain testimony, when in fact the trial court ultimately did strike the testimony and admonish the jury to disregard it. Even in oral argument, in answer to specific questions from the bench, the defendants' counsel assured this court that the record contains the defendants' motions *in limine* which underpins one of the defendant's main arguments, but counsel presented no page record reference, and we have not found any such motions in the record. Supreme Court Rule 341 (210 Ill. 2d Rs. 341(h)(6), (h)(7)) requires that the parties to an appeal cite to specific record pages in support of their statements of fact and their arguments.[2] See generally Engle, 393 Ill. App. 3d at 854, 912 N.E.2d at 728-29; citing Mikrut v. First Bank of Oak Park, 359 Ill. App. 3d 37, 51, 832 N.E.2d 376, 387 (2005). The supreme court rules that govern

---

[2]Several weeks after oral argument, the defendants filed a motion attempting to "clarify" their erroneous statements to this court in response to specific questions from the court during oral argument. This court's questions were focused upon one of the defendant's arguments that was clearly based on factual contentions not contained in the record. Defendants may not retrospectively circumvent proper appellate procedure by submission of a tardy motion *after* the case has been heard. We consider that motion within the resolution of the case and hereby deny it.

appellate practice are mandatory and must not be treated as mere suggestions. This court has repeatedly warned appellate parties that they may not treat this court as a repository for facts and arguments that are not supported by specific, accurate, record citations. It is not the responsibility of this court to scour the record in search of facts that support the argument being advanced by a party. Rather, it is the responsibility of the parties to conform to the requirements of the supreme court rules and ascertain the accuracy of their facts and statements before presenting argument to this court.

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HOFFMAN and THEIS, JJ., concur.