2025 IL App (1st) 250134-U

SECOND DIVISION
December 16, 2025

No. 1-25-0134

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JOSHUA ADAMS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19 D 79580 |
| | ) | |
| ERICA CUELLAR, | ) | Honorable |
| | ) | Julie Aimen, |
| Respondent-Appellee. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1     ***Held***:  We affirm the circuit court's grant of the majority of parenting time of minor daughter to respondent mother over petitioner father's claims that the court erred in its application of the statutory best interests factors.

¶ 2    Joshua Adams petitioned the circuit court of Cook County for majority parenting time of his minor daughter, S.A., whom he fathered with respondent Erica Cuellar.[1] Joshua also requested permission to relocate her to Kentucky (where he has lived throughout this litigation), arguing the move would be in S.A.'s best interests. After years of litigation, the circuit court issued a written order granting Erica the majority of parenting time. Joshua appeals that order. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Rule 341(h)

¶ 5    At the outset, we note that neither party has provided this court with a sufficient statement of facts. Illinois Supreme Court Rule 341(h)(6) required Joshua to include a statement of facts "necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Although Joshua has included a "statement of facts" section in his brief, he has barely set forth any facts, argued just as much in that section of his brief as in his "argument" section, and failed to cite to the record on appeal and report of proceedings throughout. These are clear violations of Rule 341(h)(6). See *id.* Our supreme court rules are not mere suggestions; they have the force of law, and the parties must abide by them. *Rosestone Investments, LLC v. Garner*, 2013 IL App (1st) 123422, ¶ 18. We have the inherent authority to dismiss an appeal or strike a brief where a party's brief does not comply with supreme court rules.

---

[1]We acknowledge that, effective January 1, 2016, the phrases "allocation of parental responsibilities: decision making" and "allocation of parental responsibilities: parenting time" have replaced the phrase "custody" throughout the Illinois Marriage and Dissolution of Marriage Act. See Pub. Act 99-90, §§ 5-15 (eff. Jan. 1, 2016). As this change went into effect relatively recently, some decisions cited herein use the former nomenclature, but the substance of the law has not materially changed as it relates to the issues in this appeal.

See *North Community Bank v. 17011 South Park Avenue, LLC*, 2015 IL App (1st) 133672, ¶ 14.

However, we recognize that doing so would be a harsh sanction. *In re Detention of Powell*, 217

Ill. 2d 123, 132 (2005).[2] Although the shortcomings of Joshua's "statement of facts" section

needlessly complicate our review, we rely on the record on appeal (approximately 2700 pages)

and the report of proceedings (more than 2500 pages) in extracting the facts relevant to our

resolution of his appeal. In summarizing the circuit court's orders throughout this litigation, we

relate only the portions of the orders germane to this appeal.

¶ 6                                  B. Motion Practice

¶ 7      Joshua and Erica met during one of Joshua's work trips to Chicago in April of 2018. It

appears he was performing IT work at the medical office where Erica was employed. At all

relevant times, Erica has lived in the Chicago area and Joshua has lived in Lexington, Kentucky.

After a brief romantic relationship, S.A. was born on April 25, 2019. Joshua and Erica never

married or lived together. Erica allegedly began refusing Joshua's calls after S.A.'s birth, and she

did not allow Joshua to see S.A. Thus, on May 21, 2019, Joshua filed a petition for allocation of

parental responsibilities in the circuit court of Cook County pursuant to the Parentage Act of 2015

(Parentage Act). See 750 ILCS 5/602 (West 2018).

¶ 8      The petition requested the court to determine parenting time and grant Joshua's request to

relocate S.A. to his place of residence in Kentucky. Joshua alleged that Erica was an unfit mother

due to her depression and lack of financial resources to support S.A. He further alleged that he, on

the other hand, was gainfully employed and able to provide a stable and nurturing environment for

---

[2]Erica's statement of facts, which is only about two pages long, does not include all background information necessary to an understanding of the case, either. Although Rule 341 does not require the appellee (here Erica) to include a statement of facts, it would have been prudent to do so given the deficiencies of Joshua's briefs.

S.A. Accordingly, he requested the court to grant him the majority of parenting time, but he remained amenable to sharing major decision-making authority equally with Erica regarding S.A.'s education, health, religion, and extracurricular activities. Before the court ruled on that petition, Joshua filed two more documents with the court.

¶ 9    On September 10, 2019, Joshua filed a petition requesting the court to appoint a guardian *ad litem* (GAL) for S.A., citing "major concerns" over Erica's ability to effectively parent their minor child. On the same day, he filed a motion for temporary parenting time, citing similar concerns and requesting either liberal parenting time or primary physical custody.

¶ 10   On September 11, 2019, Erica filed a petition requesting the allocation of the majority of parenting time in her favor and requiring Joshua to contribute to child support, daycare, and her attorney fees. As to parenting time, she alleged having a close and loving relationship with S.A. and being her primary caretaker since birth. As to child support and daycare expenses, she alleged that, although she was gainfully employed, she lacked sufficient income to support S.A. by herself. Finally, Erica sought attorney fees incurred in the preparation of her petition.

¶ 11   On December 6, 2019, the parties appeared in court through counsel. The court ordered the following: (1) Joshua to pay Erica $926 monthly in child support; (2) Joshua to pay Erica 50% of daycare costs; (3) Erica to facilitate video calling three times per week between Joshua and S.A.; (4) Erica to travel to Lexington, Kentucky (at Joshua's expense) for a weekend and allow Joshua eight hours of unsupervised parenting time with S.A. on Saturday and Sunday each; and (5) Erica to facilitate Joshua's access to S.A.'s medical care and daycare information. The court also set a status hearing for January 28, 2020.

¶ 12   On December 23, 2019, Joshua filed four documents with the court. Joshua again petitioned the court to appoint a GAL. He also filed a motion for a parenting evaluation under

section 604.10(b) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act). See 750 ILCS 5/604.10(b) (West 2018). Joshua alleged that the appointment of a professional to conduct a parenting evaluation would aid the court in resolving and determining the allocation of parenting time, given the parties' inability to agree on this matter. He also alleged that an evaluation was in S.A.'s best interests. Additionally, Joshua filed a motion to refer the matter to mediation. Finally, Joshua filed a notice of intent to relocate S.A. to Lexington, Kentucky in August of 2020.

¶ 13    On January 6, 2020, Joshua moved the court to reconsider its December 6, 2019, order. Specifically, he challenged the court's award of $926 in child support to Erica. Joshua alleged that the court did not have adequate information about either party's income, so it was unclear how it arrived at the $926 figure. He further alleged that he should not be required to pay for child support prior to an exchange of financial information.

¶ 14    On January 28, 2020, the circuit court (1) granted Joshua 28 days to respond to Erica's petition for attorney fees; (2) granted Erica 28 days to respond to Joshua's motion to reconsider the December 6 order; (3) ordered the parties to exchange updated financial affidavits; and (4) ordered the parties to attend mediation.

¶ 15    The parties attended mediation, but it proved unsuccessful.

¶ 16    On July 23, 2020, the court issued an order specifying the days and times during which Joshua was to see S.A. over video calling, setting forth which weekends Joshua would see S.A. in person, ordering Joshua and Erica to exchange their respective child support calculations within 30 days, acknowledging its appointment of a GAL in a separate order, and continuing the matter to October 7, 2020. On July 28, 2020, the circuit court appointed Marta Coblitz as S.A.'s GAL and ordered Joshua to pay Coblitz's fees.

¶ 17     On November 23, 2020, the circuit court entered an agreed order reducing Joshua's child support obligation to $825 per month, giving Joshua parenting time in Chicago every other weekend from 12 p.m. Saturday through 4 p.m. Sunday, and allowing Joshua to schedule developmental testing and/or therapy for S.A. during his parenting time, provided it would take place in Chicago and be covered by Erica's insurance (through which S.A. has been insured throughout this case).

¶ 18     On January 20, 2021, the court entered an order extending Joshua's visitation to include Friday nights. Over the next several months, the court entered additional orders expanding Joshua's parenting time.

¶ 19     July 22, 2021, the court entered an agreed order (1) allowing the continuation of Joshua's parenting time in Kentucky, (2) requiring both parties to contact a parenting counselor, (3) requiring Erica to provide Joshua contact information for S.A.'s speech therapist, and (4) setting a status date for September 9, 2021. On September 9, 2021, the court held a status hearing and ordered the parties to file a proposed allocation judgment and parenting plan within 45 days.

¶ 20     On October 19, 2021, Joshua filed a petition for a "finding of abuse of allocated parenting time and for [a] finding of indirect civil contempt and other relief." Specifically, he alleged that Erica had consistently engaged in a pattern of behavior designed to alienate him from S.A.'s life and frustrate his ability to exercise his parenting time. At the beginning of the case, Erica refused to send photographs or information related to S.A. and did not allow him to video call with S.A. Erica initially did not agree to mediation, claiming it would not work. She also took issue with the appointment of a GAL, and she refused to even negotiate Joshua's parenting time. Joshua alleged that Erica violated several court orders by (1) refusing to facilitate video calling, (2) failing to participate in therapy, and (3) failing to provide him information regarding S.A.'s speech therapist.

¶ 21     On October 26, 2021, Joshua filed a motion to reallocate the GAL's fees and costs, asking the court to split the GAL's fees and costs 50/50 with Erica.

¶ 22     On November 9, 2021, Erica responded to Joshua's October 19, 2021, petition, denying the majority of Joshua's allegations. As to count I, Erica stated that when she attempted to engage S.A. at Joshua's request, he became irate at her interference with the call. When she allowed the calls to progress without her aid, he became furious that she was not properly facilitating the call. As to count II, Erica explained that she exited joint therapy when Joshua became verbally abusive. As to count III, Erica denied that she had failed to provide Joshua information about S.A.'s speech therapist.

¶ 23     On March 9, 2022, the court entered an order (1) granting Joshua parenting time to include S.A.'s birthday that year; (2) requiring Erica to notify Joshua whether she filed income tax returns for 2021 claiming S.A. as a dependent (if not, Joshua would be permitted to claim S.A. for 2021 and future odd years); (3) requiring the parties to exchange financial affidavits, 2021 W-2s, year-end pay stubs, and 2020 tax returns; and (4) setting an April 25, 2022, status date. The court also set the matter for trial on October 12 and 13, 2022.

¶ 24     On April 26, 2022, the circuit court set a pretrial conference on all issues for July 20, 2022.

¶ 25     On May 10, 2022, Joshua filed his amended motion for a section 604.10(b) parenting evaluation. See 750 ILCS 5/604.10(b) (West 2022). The motion was nearly identical to Joshua's December 23, 2019, motion; however, the amended motion included an extra paragraph that read "This matter is set for trial on October 12, 2022." On May 26, 2022, the court appointed Dr. Mary Gardner, a clinical psychologist, as the court's section 604.10(b) evaluator. See *id*. The court ordered Joshua to pay for 80% of Dr. Gardner's fees, and Erica to pay the remaining 20%, subject to future reallocation.

¶ 26    On July 28, 2022, Joshua filed another petition for adjudication of indirect civil contempt, again arguing, as he did in his October 19, 2021, petition, that Erica had been violating the circuit court's orders.[3]

¶ 27    On August 29, 2022, the circuit court set the matter for trial on December 19 through 21, 2022. On October 11, 2022, the court struck those dates and instead set a hearing on modification of temporary child support for December 19, 2022.

¶ 28                        C. Section 604.10 Evaluations

¶ 29    In allocating decision-making authority and parenting time, the court relied heavily on the section 604.10 evaluations from two psychologists, so we set forth their findings in detail below. Dr. Mary Gardner was the court-appointed section 604.10(b) evaluator, and Dr. Marc Drummond was Erica's retained evaluator under section 604.10(c). See 750 ILCS 5/604.10(b), (c) (West 2022).

¶ 30                        1. Dr. Mary Gardner

¶ 31    On November 4, 2022, Dr. Gardner completed her section 604.10(b) custody evaluation report, recommending S.A.'s transfer to Joshua's care and granting him about 70% of parenting time. At that time, S.A. was approximately three and a half years old.

¶ 32    Dr. Gardner first summarized the statements made by Joshua and Erica during the time that she spent speaking with them during her evaluation of this matter. The quotations we use below are verbatim excerpts from Dr. Gardner's report.

¶ 33                        *a. Joshua's Statements*

---

[3]On September 8, 2022, Erica responded, denying most of Joshua's allegations.

¶ 34     Joshua was born in Lexington, Kentucky, and grew up in poverty. He graduated from high school and attended the University of Kentucky and the University of Phoenix for information technology (IT). At the time of the interview, Joshua had worked for an IT company since 2006. He denied any significant substance abuse and did not have health issues.

¶ 35     Joshua stated that he met Erica in Chicago in April of 2018 while he was there for work. They had a casual romantic relationship that led to Erica's pregnancy. After Erica became pregnant, he visited her about 10 times, but their relationship became difficult. She "often distorted situations" and used her pregnancy as a manipulation tool. However, they initially agreed that they would split the costs of childcare, including a nanny. Joshua was present for S.A.'s birth in Chicago and assisted by purchasing a crib and other necessities. Things deteriorated quickly after the birth, and Erica began to ignore Joshua's text messages. Despite their earlier agreement, Erica did not hire a nanny and wanted Joshua to pay medical costs. She refused to allow him to see S.A., so eventually, he contacted an attorney and commenced this lawsuit. Joshua was finally able to see S.A. after the court issued its December 6, 2019, temporary parenting plan.

¶ 36     Joshua soon became worried about Erica's parenting because he knew that she had two older children, and he learned that the Department of Child and Family Services (DCFS) had been involved. Apparently, DCFS had removed the children from Erica's care due to physical abuse. The older child, Brandon V., told Joshua that they sometimes did not have food in the house.

¶ 37     Erica did not allow Joshua to see S.A. for four months when the COVID-19 pandemic began. The court then ordered Erica to visit in Kentucky with S.A., and Joshua paid for her airfare, hotel, rental car, car seat, groceries, and diapers. The court later ordered that Erica more frequently travel to Kentucky for Joshua's parenting time. Erica would repeatedly request Joshua to reschedule her flights.

¶ 38    Around the time the court appointed Coblitz as S.A.'s GAL in September of 2021, S.A. began to sustain injuries, including black eyes. When Joshua attempted to speak to the daycare about S.A.'s injuries, Erica's cousin (who ran the daycare), put him on hold and did not respond to his inquiry. S.A. had a "bad gash" on her eye in October of 2021. As time went on, "things got worse." Erica ignored Joshua's emails about S.A. and would fight him at each visit. Nonetheless, he continued to fly to Chicago monthly to see his daughter.

¶ 39    Joshua observed that S.A. was developmentally behind other children her age because she had difficulties with speech. She was also aggressive with the other children at daycare. Joshua asked Erica to have S.A. tested for developmental delays, or, alternatively, to allow him to test her in Kentucky, but she refused both options. Eventually, he requested the court to order a speech therapy appointment, and only then did S.A. begin receiving therapy from Dr. Deborah Manus. At the time of Dr. Gardner's report, Joshua did not know whether S.A. was still receiving speech therapy; however, he had requested the court to order Erica to provide him with updated medical records. The court later granted this request.

¶ 40    Joshua feared that Erica's anger toward him "was so extreme" that she would not inform him about S.A.'s essential needs. "Every second [Joshua] got with [S.A.] was court ordered." In January of 2022, S.A. had a skin rash; Joshua informed Erica, but she did not take S.A. to a doctor. The rash persisted for months, and Joshua does not know whether S.A. ever saw a dermatologist. Joshua believed that Erica kept other important information from him, including S.A.'s antibiotic treatment for pneumonia in July of 2021.[4] All in all, Joshua strongly believed that Erica was unable to properly care for S.A.'s fundamental needs.

---

[4]He learned this information from the daycare later.

¶ 41    Dr. Gardner also gave Joshua a questionnaire to answer, and she administered several tests, including a mental status examination, a cognitive assessment, and a personality test. She noted Joshua was alert and oriented throughout. Overall, his eye contact was direct, he answered Dr. Gardner's emails promptly, and he arrived on time for appointments. He did not display any emotional dysregulation, and his thoughts were linear, logical, and goal-directed. Overall, the results of the tests were unremarkable.

¶ 42                                        *b. Erica's Statements*

¶ 43    Erica was born in Chicago. She believed that her parents did the best they could in raising her, but they did sometimes physically abuse her. However, DCFS was never involved when she was a child. She graduated high school and later received an associate degree from Robert Morris College. She has never been married. She has two children, Brandon V. and Josh V., by another man.[5] Her younger son, Josh, resided with his father, and Brandon lived with her. At the time of the interview, Erica had been employed with Lake Street Family Physicians for a decade. She related having some issues with anxiety years ago and had been prescribed and had taken Lexapro and Xanax in the past.

¶ 44    Erica stated that she met Joshua in Chicago in March of 2018 when he traveled there for business. They went on dates and spent time together. They were together for about six months, and he would visit her once a month from Kentucky. She became pregnant in August of 2018. Joshua asked her to abort the pregnancy three times, but she said no each time, and the relationship "fell apart." They began to argue frequently. As an example, she stated that he once asked her if she needed clothes or something else, then then "turned around to blame her for reportedly being poor."

---

[5]Herein, we use "Josh" to refer to Erica's son, and "Joshua" to refer to Joshua Adams, the petitioner.

¶ 45    Joshua traveled to Chicago for S.A.'s birth. They continued to have arguments, and Joshua became cold and distant. Erica did not want to put Joshua's name on the birth certificate. Joshua was angry about having to give Erica money. A week after the birth, Erica received a letter from an attorney stating that if she gave S.A. to Joshua, she would not have to pay child support. She ignored the letter. Joshua sued her.

¶ 46    The next time Joshua was in town, he told Erica that his lawyer advised him to relocate S.A. to Kentucky. This frightened Erica and she was afraid to allow him any parenting time at all. She was against overnight visits, but she hoped they would "work out" a parenting plan.

¶ 47    Joshua "started a smear campaign against" Erica. Erica related that he fabricated a story about Erica hitting her son on the back of the head. At this point, she realized that Joshua was trying to take her daughter away from her. The GAL, Coblitz, referred Joshua and Erica to Pat Lazurek, a licensed clinical social worker, to help with co-parenting, but it was unsuccessful and Erica did not want to return. However, the court ordered them to attend more sessions. The last session was "another bad experience" because Joshua was upset with Erica for his having missed a flight and her refusing to meet him halfway between Chicago and Lexington by car. During their last call, Joshua "started attacking her and calling her a child abuser." She disconnected the call because she felt it was verbally abusive and she did not think she had to put up with it.

¶ 48    The court then ordered two visits per month, so Joshua would fly up from Kentucky. He came with his parents at least once as well. She had a good relationship with Joshua's parents at first, but Joshua did not like that, and he found a way to "portray her in a negative light," which led to the deterioration of Erica's relationship with Joshua's parents.

¶ 49    In January of 2021, Joshua was granted visitation with S.A. in Kentucky. This was difficult for S.A.; nonetheless, at the time of the interview, S.A. was visiting Joshua in Kentucky once a

month. When she would return, she would "act out" and be difficult to control. At the time of the interview, S.A. had just returned from a two-week stay in Kentucky. She was "inconsolable and had tantrums which can last for 2 days sometimes." According to Erica, S.A. "usually does not want to talk to" Joshua.

¶ 50    Erica described Joshua as narcissistic as well as verbally and physically abusive toward her. She did not specify what kind of physical abuse she was talking about.

¶ 51    On the mental status exam, Erica was alert and oriented. Her eye contact was direct, and she did not display any emotional dysregulation. Erica asked her father to help pay for the cost of the evaluation (which he did). She sometimes did not answer Dr. Gardner's messages for days, and her response was often that she was not available, so it was difficult to schedule the evaluation days. Dr. Gardner had to reach out to Coblitz to secure Erica's cooperation, and Erica often appeared angry. As to her personality, Erica produced a very defensive profile, even more so than a typical custody litigant. She denied having even minor faults and shortcomings that most people do acknowledge.

¶ 52                    *c. Other Sources of Information*

¶ 53    Dr. Gardner included a list of individuals who provided information about the family. Notably, Dr. Gardner interviewed Nicole Pettit, Joshua's romantic partner. Nicole and Joshua moved in together in March of 2020. Nicole met S.A. in January of 2021 and cared for her with Joshua from that point on whenever S.A. was in Kentucky. At the time of the interview, Nicole was 29 years old. She received a master's degree in social work in 2016, and she worked at a residential facility for developmentally delayed boys aged 12 to 21. She denied any significant history of substance abuse or other medical issues. Nicole reported having a good relationship with S.A., who was always happy to see her and would frequently ask to say hello on video call.

13

¶ 54                              *d. Dr. Gardner's Evaluation of S.A.*

¶ 55     The report turned to a summary of Dr. Gardner's observation and evaluation of S.A. Dr. Gardner observed S.A. in two settings: one with Joshua and Nicole, and the other with only Erica. In both settings, Dr. Gardner observed S.A.'s interactions in a room that had several toys and games available. Dr. Gardner explained her role was simply that of an observer; she did not participate other than to smile or nod occasionally.

¶ 56     In the first setting, the trio (S.A., Joshua, and Nicole) arrived on time for the appointment. They all sat on the floor and looked at the toys. S.A. picked up ap a male doll and asked where "mommy" was. S.A. then looked for a baby doll and Nicole pointed to one. S.A. picked up some animals and Joshua asked what sound each animal made. It is unclear whether S.A. answered Joshua. S.A.'s speech was difficult to understand. Throughout, Joshua and Nicole reinforced politeness. Later, the trio moved on to playing with toy foods and a toy doctor kit. S.A. included Nicole by handing her toy food items. At one point, S.A. wanted two toys to fight but Joshua said "gentle." Finally, they started to play with other toys until S.A. said "Hungry! Hungry!" She had just come from daycare. Nicole offered her a snack, but S.A. refused. S.A. went to the dollhouse and pretended to let certain people into the house. "At times, S.A. asked for the mommy doll but at other times she asked for daddy."

¶ 57     In the second setting, S.A. ran up to Dr. Gardner upon entering the room and gave her a hug. S.A. and Erica sat on the floor and played with the toys. Erica asked S.A. to name some colors but S.A. did not name any. She eagerly played with Barbie dolls, and placed the Barbie and Ken dolls together, saying "daddy." She put a baby doll in between the Barbie and Ken dolls. S.A. was not very verbal. S.A. and Erica then saw the toy food container, and Erica asked for some tea. Instead of giving Erica tea, S.A. showed Dr. Gardner the Barbie doll and put the Barbie and Ken

dolls together. S.A. flitted from toy to toy, and Erica began putting some away until S.A. said "daddy!" and Erica left that doll out. S.A. then had two dolls fight each other, but Erica said "No!? No fighting." Erica asked S.A. why she was angry, to which S.A. responded she was not. Erica asked S.A. if she was happy, and S.A. said "NO!" The two returned to the toys and S.A. identified one as "daddy." S.A. had the mommy doll hit another toy and Erica said, "No hitting!" Throughout the session, S.A. alternated between the mother doll and father doll, "asking sometimes for mommy and sometimes daddy."

¶ 58                               *e. Section 602.7(b)*

¶ 59     Dr. Gardner then analyzed the section 602.5(c) and 602.7(b) factors. See 750 ILCS 5/602.5(c), 602.7(b) (West 2022). Section 602.5(c) sets forth the factors the court must consider in allocating decision-making authority. *Id.* § 602.5(c). Section 602.7(b) sets forth the factors the court must consider in allocating parenting time. *Id.* § 602.7(b). We summarize Dr. Gardner's findings as to the section 602.7(b) factors only, as Joshua does not challenge the court's determination on decision-making (which is dealt with in section 602.5(c)). See *id.* § 602.5(c).

¶ 60     Dr. Gardner explicitly discussed each factor:

1. **The wishes of each parent seeking parenting time/decision-making.**[6] Each parent wished to be granted the majority of parenting time. Dr. Gardner found this factor neutral.

2. **The wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preference as it relates to decision-making and parenting time.** S.A. was approximately three years old at the time of the evaluation

---

[6]We use bold typeface so that it is readily distinguishable which portions are factors, and which portions are Dr. Gardner's findings.

and was not able to offer any custodian preference. S.A. loved both parents and needed both in her life. Dr. Gardner gave this factor minimal weight due to S.A.'s young age.

3. **The amount of time each parent has spent performing caretaking functions with respect to the child in the 24 months preceding the filing of the petition for allocation of parental responsibilities.** Erica has been S.A.'s primary caretaker since her birth and Joshua's parenting time had been increasing steadily since the beginning of the lawsuit. Joshua and Erica have disagreed as to the kinds of services S.A. needed. This factor did not favor one parent over the other.

4. **Any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child.** The parents have disagreed about caretaking since S.A.'s birth, so this factor did not favor either parent over the other.

5. **The interaction and interrelationship of the child with her parents and siblings and with any other person who may significantly affect the child's best interests.** S.A. had a positive and enduring bond with both Joshua and Erica. Joshua has consistently exercised considerable effort by flying up to Chicago to visit S.A. on a regular basis. S.A. has lived with Erica since birth and spent time with her on a daily basis. Brandon, Erica's older son, also sees S.A. on weekends, but it was unknown to Dr. Gardner what type of relationship S.A. had with Brandon and Josh.

Dr. Gardner examined footage of various video calls between S.A. and Joshua. She noted some "concerning aspects." For instance, Erica did not prepare S.A. for the beginning or end of the call. In one video, Dr. Gardner observed S.A. cry while in Erica's care while "someone went to turn off the call." In another video, S.A. dropped her bagel, began to cry, and no one picked it up for her for several minutes. According

16

to Dr. Gardner, Erica's understanding of how her actions toward Joshua impacted S.A. was weak.

Dr. Gardner characterized the conflict between Joshua and Erica as "extremely high." Dr. Garner reviewed logs from Talking Parents, a smartphone application designed for co-parenting communication, and noticed Erica frequently disparaged Joshua, calling him a child abuser and suggesting he was bipolar. "Erica in general is incensed at [Joshua's] actions and takes offense at how she feels he has demeaned her."

Dr. Gardner attempted to investigate the type of relationship S.A. had with Brandon and Josh. She reviewed court petitions pertaining to the DCFS case in which Erica was indicated for child abuse. She noted that the boys' father "entered a Petition alleging DCFS involvement due to physical abuse of the boys by [Erica]." Dr. Gardner asked Erica about these issues, and Erica told Dr. Gardner that she deeply regretted the incidents but contended they had no bearing on the current case. Dr. Gardner concluded this factor favored Joshua.

6. **The child's adjustment to her home, school, and community.** Erica resided in LaGrange, Illinois, and Joshua lived in Lexington, Kentucky. According to Joshua, S.A. easily adjusted to his home. Erica reported that S.A. had "very difficult transitions" coming back to her. Erica stated that S.A. would be inconsolable and difficult to manage behaviorally for two to three days. Dr. Gardner found this factor neutral.

7. **The mental and physical health of all individuals involved.** The report evaluated S.A.'s health in depth. Erica related that S.A. had never seen a dentist, and she stated she had no "particular reason why she had not done this." Further, S.A.'s

developmental needs were an issue in this case. Dr. Gardner noted that Joshua had asked S.A. to be evaluated for her developmental needs early on; Erica still had not taken S.A. in for an evaluation by Early Intervention, a free service to all parents in Illinois. However, Erica did have S.A. evaluated by two doctors. Dr. Marilyn Featherston concluded that S.A. was delayed "but was closing the gap each month." Dr. Kyle Bersted, a developmental psychologist who played with S.A. and had Erica complete forms, told Erica that S.A. was not on the autism spectrum. We discuss details of these doctors' diagnoses below.

Dr. Gardner stated that Joshua related to her that Erica refused to answer any of his questions about S.A.'s developmental needs and would not give him the Early Intervention evaluation's results (once the evaluation had taken place). At the time she had interviewed Joshua, he was not aware that S.A. had seen doctors Featherston and Bersted.

As to S.A.'s developmental needs, Dr. Gardner's investigation yielded the following. She first reviewed S.A.'s pediatric records, noting that Dr. Deborah Manus, S.A.'s primary physician, raised concern for S.A.'s language development on November 17, 2020, when S.A. was about a year and a half old. Dr. Manus had requested a follow-up in three months, but the visit date did not occur until five months later. At that visit, Dr. Manus again described language deficits and diagnosed S.A. with an expressive language disorder. Dr. Manus referred S.A. to Early Intervention. Later she also referred S.A. for a behavioral evaluation in addition to language. One of the later medical concerns listed included toe-walking, a symptom associated with autism. The doctor recommended physical therapy for toe-walking.

18

Dr. Gardner then reviewed the Early Intervention records. S.A. had her first contact with Early Intervention Services for an evaluation on June 20, 2021, nearly eight months after Dr. Manus first raised concerns. Erica blamed the pandemic for not scheduling it sooner. The evaluation indicated that S.A. had a 42% delay in expressive language and a 31% delay in gesture-communication development. She aged out of the services when she turned three and was referred to a developmental pediatrician.

Four months later, on August 29, 2022, Dr. Featherston evaluated S.A. and diagnosed her with a global developmental delay. Dr. Gardner called Dr. Bersted twice, but he did not return her calls. Joshua was not involved in either assessment. Dr. Gardner stressed the importance of having both parents' information in making any diagnosis or recommendation.

Finally, medical records showed that Joshua contacted DCFS for a black eye on S.A. that occurred in July of 2020. Dr. Gardner observed that at that time, the daycare records revealed S.A. "accidentally fell [at] daycare, and the daycare immediately contacted Erica." Dr. Gardner concluded this factor weighed in Joshua's favor.

8. **The child's needs.** S.A. needed to immediately begin receiving critical developmental services from specialists, and both parents had to be involved in these services. This factor weighed more in favor of Joshua than Erica.

9. **The distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the parents' abilities to cooperate in the arrangement.** Dr. Gardner found this factor critical to this case and stated she discussed it throughout the report.

10. **Whether a restriction on parenting time is appropriate.** Dr. Gardner noted that visitation rights could not be restricted unless the court found the visitation would "endanger seriously the child's physical, mental, moral, or emotional health." She found this factor neutral, and she did not believe there was serious endangerment threat in this case.

11. **The physical violence or threat of physical violence the child's parent directed against the child or other member of the child's household.** Dr. Gardner stated she had not received any documentation of physical violence in this case and therefore labeled this factor as neutral.

12. **The willingness and ability of each parent to place the needs of the child ahead of his or her own needs.** Dr. Gardner found that Erica's negative feelings about Joshua sometimes won out over some of S.A.'s needs. If Joshua suggested something, Erica would resist it. Dr. Gardner did not provide an example. She did note that Erica's intense anger at Joshua resulted in her failure to respond to important messages from him about S.A.'s welfare. Dr. Gardner concluded that this favor weighed in Joshua's favor.

13. **The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.** Erica's anger sometimes prohibited her from responding to Joshua and facilitating his contact with S.A. This favor also weighed in Joshua's favor.

14. **The occurrence of abuse against the child or other members of the child's household.** According to Dr. Gardner, Erica had acknowledged that DCFS previously found she had engaged in child abuse when she hit her then-11-year-old son Brandon

with a belt. She regretted doing so and had worked through the issue in therapy. Dr. Gardner found this factor did not weigh in either party's benefit.

¶ 61                                    *f. Dr. Gardner's Recommendations*

¶ 62    The report concluded with Dr. Gardner's recommendations as to the allocation of parenting time and decision-making responsibilities. Dr. Gardner recommended that Joshua receive about 70% of parenting time, while Erica should have S.A. approximately 30% of the time. This should be the plan until S.A. starts school full time. Further, S.A. should be relocated to Lexington, Kentucky to reside with Joshua. Erica should have S.A. with her in Illinois about one week per month. As to transportation, she recommended that Joshua bring S.A. to Chicago to transfer to Erica at the airport, and that he return to Chicago to transfer S.A. back to his care. Erica should receive additional time with S.A. for all holidays and most of summertime. Further, S.A. should have daily video calling with the parent she is not with. Finally, S.A. should be enrolled in a high-quality daycare.

¶ 63    As to the allocation of decision-making responsibilities, Dr. Gardner recommended that Joshua be the sole decision-maker as to medical decisions. She further issued the following guidelines: S.A. should be immediately (1) referred to a highly qualified and experienced developmental pediatrician who can promptly perform a complete assessment; and (2) evaluated for autism. For education decision-making, Joshua should be the sole decision-maker. For extracurricular activities, each parent should have the ability to sign S.A. up for extracurriculars that occur solely during each parent's respective parenting time. For religion, the parties should have joint decision-making power, as religion did not appear to be an issue of contention.

¶ 64    Finally, Dr. Gardner issued a set of recommended rules for both parents to follow. Erica and Joshua should communicate exclusively on Talking Parents. Dr. Gardner recommended that

the messages pertain exclusively to S.A.'s needs and her care. Each parent must refrain from commenting on the other's behavior and discussing the conduct of the other parent in S.A.'s presence, except in a positive way. Both parents should support S.A.'s relationship with the other parent, for S.A.'s own welfare. Each should make positive statements about the other parent in S.A.'s presence. Dr. Gardner further recommended that major holidays be shared, each parent should have up to two weeks of uninterrupted parenting time during the year, S.A. should be with Erica for Mother's Day and with Joshua for Father's Day, and S.A. should be with each parent on that parent's birthday.

¶ 65     Later at trial, Dr. Gardner clarified that S.A.'s relocation to Kentucky should be gradual. She recommended a "step-up" plan:

> "A step-up plan would be Josh would have eight days not seven days. And the month after that, he might have nine days, not eight days. And a month or two after that, depending on how she reacted, there might be an additional day. So, it would be very gradual based on the child's reaction."

¶ 66                              2. Dr. Marc Drummond

¶ 67     Erica retained Dr. Marc Drummond, a licensed clinical psychologist.[7] Dr. Drummond had been a licensed clinical professional counselor since 1996, and in 2000, he received his doctoral degree in clinical psychology. In 2011, he was licensed as a clinical psychologist. At the time of trial in this case, Dr. Drummond was also a nationally certified evaluator, and had been the primary investigator in nearly 150 section 604.10(b) evaluations. In his report dated April 28, 2023, he concluded that it was in S.A.'s best interest to remain in Erica's care indefinitely. S.A. was

---

[7]On December 12, 2022, Erica requested the appointment of a professional evaluator of her choosing, Dr. Drummond, under section 604.10(c). See 750 ILCS 5/604.10(c) (West 2022).

approximately four years old at the time of Dr. Drummond's evaluation and report. Dr. Drummond's report was much shorter than Dr. Gardner's, as reflected in our summary below.

¶ 68    Dr. Drummond first summarized his findings regarding Joshua. The quotations we use below are verbatim excerpts from Dr. Drummond's report.

¶ 69                                *a. Summary of Joshua*

¶ 70    In addition to the basic biographical information for Joshua included in Dr. Gardner's report above, Dr. Drummond noted that Joshua's parents divorced when he was approximately two and a half years old. Joshua reported having a poor relationship with his mother, which included emotional and physical abuse. Joshua did not see his biological father from the time of the divorce until he was approximately 13 years old, at which point the two began reviving their relationship. When he was 14 years old, his mother moved the family to Arizona. Joshua ran away from home and was placed in foster care. The authorities could not locate his mother. His biological father flew him back to Kentucky to live with him. Joshua did not report any serious medical issues, hospitalizations, arrests, or any other legal issues.

¶ 71                                *b. Summary of Erica*

¶ 72    In addition to the basic biographical information for Erica included in Dr. Gardner's report that we summarized above, Dr. Drummond noted that Erica's parents were also divorced. It is unclear when that occurred. Erica grew up with her father and stepmother. Although she visited her biological mother occasionally, the visits were not regular and her mother passed away when Erica was 22 years old. Erica reported that she was responsible for "taking care of the home" while she lived with her father. Her father reportedly used corporal punishment and grounding. Erica became pregnant with her first son, Brandon, toward the end of high school, and thereafter she and Brandon's father relocated to Rock Falls, Illinois. Shortly after her second son, Josh, was born,

Erica and her sons' father separated. Erica moved back to the Chicago area and graduated from Robert Morris College, landing a job at the medical office where she was still working at the time of the evaluation.

¶ 73    In 2013, Erica's custody dispute over her two sons began. Erica reported seeking custody of her sons, but both were placed with their father. She received visitation every other weekend and during holidays. Erica moved in with her own father in Lyons, Illinois. In 2016, she petitioned the court for more parenting time, and Brandon moved in with her (and her father) for his senior year of high school while Josh remained with his father in Oswego, Illinois. At the time of the evaluation, Erica had moved to an apartment in LaGrange while Brandon had remained with his grandfather in Lyons.

¶ 74    Erica did not report any chronic medical conditions and denied taking medications. She was never hospitalized. Erica sought therapy approximately six years prior. She stated she did not use drugs but drank alcohol occasionally. She was arrested in 2012 for child endangerment for having struck her son.

¶ 75                        *c. Summary of Joshua and Erica's Relationship*

¶ 76    The report turned to a chronological summary of Joshua and Erica's relationship. Most of Dr. Drummond's summary was consistent with what Dr. Gardner had already described. Notably, though, Dr. Drummond stated that Erica's understanding of her relationship with Joshua at the beginning was that Joshua would sell all his Kentucky assets and move to Illinois. However, according to Erica, a "switch flipped" when she informed him of the pregnancy, and he became cold and distant. According to Joshua, he did not want a serious relationship because he believed Erica "had a great deal of familial stress." Both parties considered aborting the pregnancy, but ultimately Erica chose not to do so. According to Joshua, Erica had agreed to relocate to Kentucky

if Joshua could provide a home, but her family did not support the move. Overall, Dr. Drummond's synopsis of the relationship was similar to Dr. Gardner's.

¶ 77 *d. Other Sources of Information*

¶ 78 Dr. Drummond spoke with the GAL, Marta Coblitz. Coblitz told Dr. Drummond that Erica "was willing to take any cancellations to get in quicker" to see Dr. Drummond. According to Dr. Drummond, Coblitz did not have any concerns about either parent's parenting. She had encouraged Joshua to move to Illinois to be closer to S.A. Coblitz commended Joshua on all that he has done and everything he had endured to be in S.A.'s life.

¶ 79 Dr. Drummond also spoke with Brandon, Erica's older son. Brandon described the DCFS investigation that caused DCFS to remove him and Josh from Erica's care. Brandon stated that his relationship with Erica was much better and that he was not the easiest child to parent, given his behavior growing up. He described Erica as a "good mom."

¶ 80 *e. Dr. Drummond's Evaluation of S.A.*

¶ 81 Dr. Drummond observed S.A. in two settings: with Joshua and Nicole in Kentucky, and with Erica in his office and at Erica's home. With Joshua and Nicole, Dr. Drummond described her as comfortable and social in Joshua's home, while engaging in non-directive play. In the settings with Erica, S.A. engaged in non-directive play and was cooperative with Erica. Dr. Drummond observed that S.A. was easily directable, and a "happy and social child." He did also notice she was unstable on her feet, hitting her head against the wall while playing with Dr. Drummond.

¶ 82 At the time of the report, S.A. was in Early Intervention and had an individualized education plan. She was in speech therapy and physical therapy to address her toe-walking. S.A. was in daycare, but Erica was considering a more formalized preschool. Since beginning therapy,

both parents had noticed improvement in her speech and motor skills. S.A. was still delayed in her speech and educational aspects, but "by all accounts [was] improving due to her various therapies."

¶ 83    Finally, Dr. Drummond noted that there was no notable transition period upon S.A.'s arrival in Kentucky. However, upon returning to Illinois, it would take S.A. one to three days to reacclimate (according to Erica).

¶ 84                    *f. Section 602.7(b) and Recommendations*

¶ 85    The report closed with a section that analyzed the section 602.7(b) factors and provided recommendations. As to the factors, Dr. Drummond found the following:

1. **Wishes of the parents as to custody.**[8] "Erica would love to share custody 50-50; however, she states that this is not possible due to lack of communication." Therefore, she requested residential custody on a 75%-25% basis, granting Joshua parenting time over summers and extended breaks. Joshua requested the majority of parenting time and wished to relocate S.A. to his home in Kentucky.

2. **Wishes of the child.** "Due to the child's age there was no direct conversation of the child's desires."

3. **Likely adjustment of the child.** S.A. appeared comfortable in both homes, but there would likely be a longer adjustment period for her in Kentucky, as she had ever only lived with Erica in the Chicago area.

4. **Distance between the parties.** Joshua and Erica lived about six hours' drive from each other.

---

[8]We use bold typeface so that it is readily distinguishable which portions are factors, and which portions are Dr. Drummond's findings.

5. **Mental and physical health of all involved.** Erica did not have any chronic medical conditions or take any medications. She was seeing a counselor at the time of the evaluation, and she had been with the same one for six years. S.A. was diagnosed with a global developmental delay. She was in speech therapy, physical therapy, and had an individualized education plan.

6. **Willingness of each parent to encourage a close and continuing relationship with the other parent.** Both parents stated that it was important for the other parent to be in S.A.'s life.

7. **Prior agreement of conduct between the parties.** Most recently, Joshua had been receiving one week of parenting time a month, with the remainder given to Erica.

8. **Threat of physical violence toward the child.** Erica was not concerned about any threat of physical violence from Joshua but did express concern over emotional abuse. Joshua was concerned about the numerous black eyes S.A. had had while under Erica's care.

9. **Occurrence of domestic violence during the relationship.** Erica reported emotional and verbal abuse, as well as "physical intimidation" during the relationship with Joshua but did not report abuse with physical contact. Joshua did not note any domestic violence in their relationship.

10. **Concerns about future violence.** Erica did not have any concerns. Joshua was concerned that Erica had tried to provoke him in the past.

11. **The child's needs.** Both parents were aware of S.A.'s needs. Joshua was concerned that Erica was neglectful in obtaining services for S.A. He also believed that Erica

downplayed all of S.A.'s needs. Erica was aware of the numerous therapies S.A. needed and stated that she followed all recommendations from S.A.'s care team.

Based on the results of his evaluation, Dr. Drummond recommended a 50-50 split in parenting time if the parents were to live closer to each other. However, given the distance, Erica should be given the majority of parenting time.

¶ 86                                 D. The Order on Appeal

¶ 87                            1. Further Motion Practice and the Trial

¶ 88    On November 18, 2022, Joshua filed a petition for temporary and permanent allocation of majority parenting time, sole medical and educational decision-making, and relocation to Kentucky.[9] In other words, he requested custody, all major decision-making power, and to move S.A. to his home in Kentucky. He repeated many of the same allegations that he set forth in his prior pleadings, including Erica's obstruction of Joshua's access to parenting time, video calling, S.A.'s medical records, and so on. Essentially, he argued that Erica kept him from being a meaningful part of S.A.'s life. He also alleged that Erica had not adequately facilitated medical care for S.A.'s speech delay. In support of these allegations, Joshua relied on Dr. Gardner's report.

¶ 89    On December 10, 2022, the court entered an order (1) requiring Erica to tender all of S.A.'s medical records to Joshua and Coblitz within five business days, and (2) continuing the matter to December 13, 2022. On December 21, 2022, the court granted Erica 21 days to respond to Joshua's motion to modify child support and set a hearing on it for February 28, 2023.

¶ 90    On January 4 and 5, 2023, Erica responded to Joshua's motion to modify and petition for temporary and permanent allocation of majority parenting time. She denied the allegations.

---

[9]On December 7, 2022, Joshua moved the court for an expedited hearing on this petition.

¶ 91    On February 16, 2023, the court struck the February 28, 2023, court date and re-set the matter for an in-person status hearing on April 20, 2023. In the February 16 order, the court also ordered Coblitz, the GAL, to conduct additional visits with S.A. On April 24, 2023, the court issued an order (1) requiring the completion of all discovery by May 26, 2023, (2) mandating the exchange of Rule 213 witness lists by May 19, 2023, (3) requiring the filing of motions *in limine* by June 12, 2023, and any responses by June 19, 2023, and (4) allowing Joshua's June parenting time over Erica's objections. Eventually, the court conducted the trial over 10 days in June, August, September, and December of 2023 and May of 2024.

¶ 92    Over the course of the relatively lengthy trial, a number of individuals testified, including but not limited to Joshua Adams, Erica Cuellar, Dr. Mary Gardner, Dr. Marc Drummond, Dr. Marilyn Featherston, Nicole Pettit, and Marta Coblitz. We do not summarize their trial testimony here because the same relevant information from these individuals is already included above, primarily in the detailed summaries of Dr. Gardner's and Dr. Drummond's reports. A litany of exhibits was entered at trial, but by far the most important and relevant to this appeal were the two reports we summarized above.

¶ 93    After trial, the court took the matter under advisement. It then issued a written decision on December 27, 2024, which provided as follows.

¶ 94                          2. The December 27, 2024, Order

¶ 95    The court first noted that the parties' acrimonious relationship had frustrated the resolution of this case. The court recognized that the issue between them centered over who would be the residential parent, not over their (in)ability to make thoughtful decisions about their child. The court expressed concern over whether the parties' then-current state of affairs would allow them

to co-parent effectively going forward. The two key issues that the circuit court addressed were how to allocate decision-making authority and parenting time.

¶ 96                           1. Decision-Making Authority

¶ 97    Based on its analysis of the relevant statutory factors, the circuit court found both Joshua and Erica fit to be parents. Accordingly, the court found it in S.A.'s best interests that they equally share decision-making responsibility for major aspects of S.A.'s life, including education, healthcare, extracurricular activities, and religion. On appeal, Joshua does not challenge the circuit court's judgment on decision-making authority.

¶ 98                                  2. Parenting Time

¶ 99    Based on its analysis of the relevant statutory factors, the circuit court determined that it was in S.A.'s best interests for Erica to retain the majority of parenting time. Notably, the court stated that "if Josh were to move to the State of Illinois this would be a fifty/fifty parenting schedule." The court also provided that the parties may not relocate S.A. more than 25 miles from Erica's address absent both parents' written consent.

¶ 100                          *a. Best Interests Analysis*

¶ 101   In a written order, the court conducted a thorough analysis of the relevant statutory best interests factors (750 ILCS 5/602.7(b) (West 2022)) in determining how to allocate parenting time:

> (1) **The wishes of each parent seeking parenting time.**[10] Erica and Joshua each have the same wishes: to have S.A. living with them in their respective cities and have the majority of parenting time.

---

[10]We use bold typeface so that it is readily distinguishable which portions are the statutory factors, and which portions reflect the circuit court's findings.

(2) **The wishes of the children, taking into account the children's maturity and ability to express reasoned and independent preferences as to parenting time.** The court found this factor inapplicable due to S.A.'s young age.

(3) **The amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth.** S.A. lived with Erica her entire life. Erica performed the majority of caretaking functions, mainly because Joshua resided in Kentucky. However, Joshua was able to perform all caretaking functions during his one week of parenting time per month. The court found that Joshua nurtured S.A. and demonstrated appropriate love and affection toward her.

(4) **Any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child.** Joshua had one week of parenting per month pursuant to the court's orders. He would fly to Chicago to pick S.A. up and fly back with her to Kentucky for his parenting time.

(5) **The interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests.** At the time of the court's order, Joshua and Nicole had one child together with whom they lived in Kentucky. Nicole had accompanied Joshua to Chicago for parenting time and to meet with Dr. Gardner. S.A. had a loving relationship with Nicole and Joshua's parents, who also lived in Kentucky. Erica has two other children from a previous relationship who did not reside with her, but she had a close relationship with them and saw them biweekly. Erica's oldest child, Brandon, reported that he and his

brother Josh were close with Erica. Erica's parents lived in Chicago. It was clear to the court that both Erica and Joshua had a close and loving relationship with S.A. The court noted that Coblitz testified that despite the parties' disdain for each other, they both treated S.A. with warmth, love, and care.

(6) **The child's adjustment to his or her home, school, and community.** The court noted that S.A. had a "team of providers" in Chicago, including an occupational therapist, a physical therapist, and a speech therapist. The court also stated that both Coblitz and Dr. Drummond testified that moving S.A. to Kentucky would involve a lengthy adjustment period because she had built a trusting relationship with her Chicago providers. The court related that Dr. Gardner recommended a gradual transition to Kentucky for S.A.

(7) **The mental and physical health of all individuals involved.** Neither parent had any chronic conditions, but Erica had been seeing a therapist.

(8) **The child's needs.** S.A. had a multitude of medical and developmental needs, and Joshua repeatedly expressed concern that Erica was not doing enough to meet those needs. However, Dr. Drummond reported that Erica had been following the recent recommendations from S.A.'s team of providers and had been coordinating her care. Again, the court stressed the importance of stability, especially with respect to S.A. remaining with the team of specialized providers she already trusted in Chicago.

(9) **The distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement.** The court noted that Joshua and Erica lived about six hours apart by car or 90 minutes by plane. The distance

required full cooperation from both parents. The court acknowledged that Joshua spent about $1,000 per month on travel to realize his parenting time.

(10) **Whether a restriction on parenting time is appropriate.** The court did not discuss this factor, presumably because it found that it did not apply in this case.

(11) **The physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household.** In 2012, Erica was arrested for striking her son; DCFS investigated Erica and indicated child abuse. The State removed both her sons, Brandon and Josh, from her home. However, Dr. Drummond related that the older son, Brandon, reported that Erica's parenting style had improved considerably and that they had a better relationship. Brandon stated that when he was a child, he "knew" how to trigger Erica's anger. Joshua had called DCFS on Erica because S.A. had a black eye. The court noted that Coblitz testified that S.A. was clumsy, and "the parties spew accusations at each other every time [S.A.] has a bump or bruise."

(12) **The willingness and ability of each parent to place the needs of the child ahead of his or her own needs.** Joshua demonstrated his love for S.A. through his persistence in having parenting time with S.A., desire to relocate her to Kentucky to live with him, and research into how to supplement S.A.'s growth and health, given her developmental delays. Erica facilitated day-to-day therapy through various providers. The court concluded that S.A. was always at the center of each parent's attention.

(13) **The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.** Although Joshua and Erica's relationship had been acrimonious throughout, Erica had been

abiding by the court's more recent rulings, and she also reported that video calling has been smoother.

¶ 102   The court omitted factors 14-17, presumably because they did not apply in this case or were discussed elsewhere. See 750 ILCS 5/602.7(b)(14), (15), (16), (17) (West 2022).

¶ 103   Based on the foregoing, the court found that it was in S.A.'s best interest to remain in Illinois, live with Erica, and that Erica have the majority of parenting time. The court turned to a description of parenting time.

¶ 104                              *b. Parenting Schedule*

¶ 105   The court set a detailed parenting schedule, including time allocation for holidays, birthdays, and school breaks. Specifically, the court (1) granted Joshua parenting time the first and third weekend of each month (one weekend in Illinois and one in Kentucky); (2) allowed Joshua parenting time over the summer beginning two weeks after school recesses and ending two weeks prior to school recommencing; (3) gave Joshua parenting time on long weekends (Friday through Monday or Thursday through Sunday); (4) permitted Joshua and Erica to modify, in writing, their respective parenting time if such modification would be in S.A.'s best interests (any specific change in parenting time would be construed as temporary in nature and one-time only); (5) stipulated that S.A. may freely transport all clothing, schoolwork, books, sports equipment, and personal items between households; (6) prohibited the use of corporal punishment; and (7) required each party to give seven days' advance notice of any travel plans, including the destination, departure and return date with flight numbers if applicable, an address where the traveling parent and S.A. will stay, and telephone numbers where S.A. can be reached.

¶ 106                           *c. The Parties' Communication*

¶ 107   Regarding communication between Erica and Joshua, the court ordered them to initially communicate with each other exclusively through Talking Parents. The court limited their communications to matters regarding parenting of S.A. and any other matters related to her wellbeing. The court prohibited them from making disparaging remarks about each other and mandated that they check the phone application twice daily. Communication between each parent and S.A. would be through the phone. The court also forbade them from making any comments to S.A. about the other parent, unless they were positive. In other words, the parties had to refrain from making comments to S.A. about the other parent if they were designed to create a negative image of the other parent in S.A.'s mind.

¶ 108                                    *d. Child Support*

¶ 109   As to child support, the circuit court compared the parties' monthly income. Joshua earned approximately $6,629 per month and Erica earned about $3,667 per month. Considering these figures along with the amounts Joshua had already paid in child support up to that point, the court allocated Joshua 55% and Erica 45% of S.A.'s expenses for extracurricular activities, school, childcare, and unreimbursed healthcare expenses.

¶ 110                                  *e. Parenting Coordinator*

¶ 111   Finally, the court required, in the event of a future conflict, the parties to first consult a parenting coordinator before coming to court. The court ordered Joshua and Erica to share the costs of the parenting coordinator equally.

¶ 112   Joshua appeals.

¶ 113                                     II. ANALYSIS

¶ 114   On appeal, Joshua challenges the circuit court's December 27, 2024, order. He purports to argue seven separate claims of error. However, his challenge is really two-fold, as his claims of

error all relate to parenting time, and one claim relates specifically to the section 604.10(b) evaluator, Dr. Gardner. Joshua contends that the circuit court erred in (1) awarding Erica the majority of parenting time, and (2) disregarding Dr. Gardner's findings.

¶ 115                                    A. Parenting Time

¶ 116   Our supreme court has long emphasized that "the best interests of the child is the 'guiding star' by which all matters affecting children must be decided. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 41 (quoting *Nye v. Nye,* 411 Ill. 408, 415 (1952)). Section 602.7(b) of the Marriage Act sets forth a nonexclusive list of 16 factors that the court must consider in considering the best interests of the child as to parenting time. 750 ILCS 5/602.7(b) (West 2024). We discuss the relevant factors below.

¶ 117   The allocation of parenting time is a matter within the sound discretion of the circuit court. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. Accordingly, we apply a deferential standard of review. *In re Marriage of Wendy L.D and George T.D*, 2017 IL App (1st) 160098, ¶ 76. The circuit court is in the best position to judge the credibility of the witnesses and determine the best interests of the child. *In re Custody of Sussenbach*, 108 Ill. 2d 489, 499 (1985). Where the evidence permits multiple inferences, we accept those inferences that support the circuit court's order. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). We "will not reverse a trial court's custody determination unless it (1) is against the manifest weight of the evidence, (2) is manifestly unjust, or (3) results from a clear abuse of discretion." *In re B.B.*, 2011 IL App (4th) 110521, ¶ 32. Under the manifest weight standard, we will affirm the circuit court's ruling if there is any basis in the record to support the circuit court's findings. *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 177 (2002). We will not reverse the circuit court's determination regarding the best interests of a child unless it is "clearly against the manifest weight of the evidence and it appears that a

manifest injustice has occurred." *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55. A judgment is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *Id.*

¶ 118   Joshua's core contention is that the circuit court improperly weighed the experts' findings and recommendations. Specifically, Joshua argues that the court: (1) erred in weighing the costs and benefits of S.A.'s (hypothetical) relocation to Kentucky; (2) disregarded Erica's noncompliance with court orders; (3) overlooked "substantial evidence of medical neglect;" and (4) "minimized" a "DCFS-indicated finding of child abuse involving another child in her care."

¶ 119                                    1. Relocation to Kentucky

¶ 120                                    *a. The Costs*

¶ 121   Joshua argues that the circuit court placed too much emphasis on the lengthy transition period that S.A. would have if she were to relocate from Chicago to Lexington, Kentucky to live with him. This contention relates to the sixth factor under section 602.7(b): "the child's adjustment to his or her home, school, and community." 750 ILCS 5/602.7(b)(6) (West 2024). The two psychologists and the court explicitly addressed this factor in their respective reports and order.

¶ 122   In her report, Dr. Gardner stated that Joshua told her that S.A. easily adjusted to his home. Later at trial, however, Dr. Gardner clarified that a lengthy transitional period under a "step-up" plan would likely be required for S.A. In his report, Dr. Drummond noted that S.A. appeared comfortable in both parents' homes but concluded there would likely be a longer adjustment period for her in Kentucky, as she had lived with Erica her whole life. In its December 27, 2024, order, the circuit court noted that S.A. had a "team of providers" in Chicago, which included various therapists: an occupational therapist, a physical therapist, and a speech therapist. Additionally, both Coblitz and Dr. Drummond testified that moving S.A. to Kentucky would involve a lengthy

adjustment period because S.A. had built a trusting relationship with her providers in Chicago. The court also acknowledged that Dr. Gardner recommended a gradual transition to Kentucky for S.A. The court noted that "having to establish a new care team in Kentucky would disrupt the progress [S.A.] has made."

¶ 123   Based on the psychologists' reports and the court's order that considered their findings, we do not see how the circuit court placed "undue weight" on the costs of S.A.'s potential transition to Kentucky. The court objectively considered that S.A. already had a team of trusted providers in Chicago. Joshua does not dispute this. The court accurately related the psychologists' findings. Joshua also does not dispute that. Finally, we note that the court's consideration of the costs of a transition amounted to only about a third of a page (out of the five pages of factor analysis) in its order. Accordingly, we find no merit to Joshua's contention; the court properly considered the costs of a potential relocation.

¶ 124                                    *b. The Benefits*

¶ 125   Joshua also argues that the court "failed to credit the substantial evidence" that showed a relocation to Kentucky would benefit S.A.'s long-term health, educational outcomes, and access to family support. However, he does not elaborate further on these points and does not cite to the record on appeal in support. We have no duty to consider these bare allegations. See *Travaglini v. Ingalls Health System*, 396 Ill. App. 3d 387, 405 (2009) ("It is not the responsibility of this court to scour the record in search of facts that support the argument being advanced by a party."). Even so, we note that the court *did* state that Nicole and S.A. had a close, loving relationship, and that Joshua's parents, who lived in Kentucky, also had a close relationship with S.A. Thus, the court clearly considered the family support that S.A. would have (and does have when she visits) in Kentucky.

¶ 126                    2. Erica's Noncompliance with Court Orders

¶ 127   Next, Joshua argues that the circuit court's disregard for Erica's noncompliance with court orders, especially where it interfered with his parenting time, constitutes reversible error.

¶ 128   The court acknowledged the parties' acrimonious relationship throughout its order, but stressed that, at the time of its ruling, Erica had "abided by [the court's] ruling so that Josh [could] exercise his parenting time." The court also noted that Erica had reported that video calling had been going better, and Erica had acknowledged the need for privacy (presumably over video call) to foster S.A.'s relationship with Joshua. Moreover, we note that, despite Joshua's multiple filings requesting the court to find Erica in contempt, the court did not do so. Thus, the court likely did not believe that Erica's shortcomings as to compliance rose to the level that would warrant a finding of contempt. We agree with the circuit court.

¶ 129   Joshua cites the case of *In re Custody of G.L.*, 2017 IL App (1st) 163171, for the proposition that a parent's persistent refusal to include the other parent in fundamental decisions about the child "strongly disfavors an award of primary parenting time." However, Joshua does not provide a citation to the paragraph where the court purportedly stated that. Additionally, we have not found anything in that decision that suggests that noncompliance necessarily strongly disfavors the award of majority parenting time. In that case, the appellate court found that the circuit court's decision regarding parenting time was not against the manifest weight of the evidence. *Id.* ¶ 49. The court considered the noncomplying parent's actions as only one factor in the overall analysis of best interests; it did *not* hold that noncompliance should be afforded any weight greater than that of other factors. Thus, we find no error here either, let alone reversible error, as Joshua argues.

¶ 130                         3. "Medical Neglect"

¶ 131   Joshua argues that the circuit court did not sufficiently consider the instances of "medical neglect," which refers to Erica's delays in having S.A. evaluated for developmental issues. We find that the court sufficiently considered this as well.

¶ 132   In its order, the circuit court stressed that S.A. had several medical and developmental needs. It noted that Joshua had expressed concern that Erica was not doing enough to meet those needs. However. the court also related a portion of Dr. Drummond's report, which stated that Erica had followed all recommendations from S.A.'s healthcare team and had coordinated all of S.A.'s care. Additionally, Erica testified that it was a mistake not to be more communicative with Joshua, and that she would try hard in the future to communicate more effectively. Erica acknowledged being hesitant to tell Joshua about S.A.'s medical needs because she feared he would contact DCFS. Erica testified, however, that going forward, she would inform Joshua of any medical appointments or emergency room visits. The court also placed importance on S.A.'s stability, and that a move to Kentucky would disrupt S.A.'s day-to-day life substantially. In noting that concern, the court related both Dr. Drummond's and the GAL's testimony that expressed these apprehensions. Based on the foregoing, we find the court sufficiently considered findings related to S.A.'s medical needs.

¶ 133                                4. Erica's DCFS Case

¶ 134   Joshua's final contention under best interests is that the court did not give enough weight to the fact that DCFS indicated Erica for child abuse after she struck her son in 2012. The two psychologists and the circuit court explicitly discussed physical abuse under factor 11 of section 602.7(b): "the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household." 750 ILCS 5/602.7(b)(11) (West 2024).

¶ 135   In her report, Dr. Gardner stated she had not received any documentation of physical violence in this case and therefore labeled this factor as neutral. In his report, Dr. Drummond stated that Joshua was concerned about the three black eyes S.A. had had while under Erica's care. In its order, the circuit court noted that Erica was arrested for "striking her son" in 2012. DCFS investigated Erica and the children were removed from her home. However, the court also noted that Erica's older son, Brandon, reported having a better relationship with Erica now. The court also related that Joshua called DCFS on Erica on one instance because S.A. had a black eye. According to Coblitz, S.A. was clumsy, and the parties spewed accusations at each other any time S.A. had a bump or bruise.

¶ 136   Joshua essentially urges us to accept his theory that Erica caused S.A.'s alleged black eyes. However, we stress that no one has corroborated this theory or provided any direct evidence that Erica caused any of S.A.'s alleged black eyes. We will not speculate that, just because Erica struck one of her sons 13 years ago, she is the culprit behind S.A.'s alleged injuries. See *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004) ("our courts have also held that there is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household."). We therefore find no error in the circuit court's analysis.

¶ 137   Overall, Joshua repeatedly contends that the circuit court ignored certain findings in this case, but a review of the record reveals that the circuit court considered everything that Joshua urges it overlooked. Joshua just disagrees with the court's weighing of the findings and factors, but that is the court's prerogative, not his. See *In re Marriage of Saheb & Khazal*, 377 Ill. App. 3d 615, 628 (2007) ("The trial court is the ultimate fact finder in a child custody case," not the expert witness or a party). Based on the foregoing, we find that the circuit court did not err in its best interests analysis.

¶ 138                    B. The Section 604.10(b) Evaluation

¶ 139   Joshua's last argument is that the circuit court "violated section 604.10(b) by disregarding the findings of its own court-appointed expert." He contends that the court abused its discretion by failing to articulate *why* it disregarded Dr. Gardner's findings. Although Joshua argues that the circuit court somehow violated the statute, his contention is actually that the court should have accepted Dr. Gardner's findings and recommendations wholesale, while ignoring Dr. Drummond's findings, as well as its own. However, this is simply not an accurate statement of the court's role.

¶ 140   We must not forget that the circuit court "is the ultimate fact finder in a child custody case, not the expert witness." *Id.* Further, the court has discretion to seek independent expert advice, but it is not bound to abide by the recommendations of its appointed experts. *In re Marriage of Wendy L.D.*, 2017 IL App (1st) 160098, ¶ 88. Rather, experts are advisors to the court, and it is within the circuit court's discretion to accept or reject some or all of the advice within the parameters of what is reasonable under the facts of a certain case. *Id.*

¶ 141   Here, the court's decision did not reflect Dr. Gardner's ultimate recommendation, which does not constitute error, as the court was free to accept or reject some or all of Dr. Gardner's advice. See *Id.* Moreover, there was sufficient evidence, as explained above, to support the circuit court's judgment. Accordingly, under our deferential standard of review, we cannot find that the circuit court's judgment was against the manifest weight of the evidence simply because it followed the section 604.10(c) evaluator's recommendations and its own findings rather than those of the section 604.10(b) evaluator.

¶ 142   Based on the foregoing, we find no error in the circuit court's decision to disregard some of Dr. Gardner's findings and instead adopt Dr. Drummond's ultimate recommendation to give Erica the majority of parenting time.

¶ 143                                III. CONCLUSION

¶ 144   Based on the foregoing, we find no error in the circuit court's allocation of parenting time or in its decision to disregard some of Dr. Gardner's recommendations. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 145   Affirmed.